JAMES B. MARINE AND VERA L. MARINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8077-85.          Filed May 11, 1989.

*Arthur A. Armstrong,* for the petitioners.
*James M. Kamman, Benjamin Duncan,* and *Jolynn L. Ricks,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies of $29,851.66, $22,034, $9,215.95, and $9,578 in petitioners' Federal income tax for 1979, 1980, 1981, and 1982, respectively, and an addition to tax under section 6661 of $957.80 for 1982. The issues for decision are (1) whether petitioners have deductible theft losses on their initial cash contributions to certain limited partnerships; (2) whether petitioners are entitled to claim losses in connection with the real

estate activities of the limited partnerships; and (3) whether petitioners are liable for additions to tax under sections 6653(a) and 6661, and additional interest under section 6621(c).

All section references are to the Internal Revenue Code as amended and in effect for the years in issue, except as otherwise noted.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Arcadia, California, when the petition was filed.

### *Petitioners' Transactions*

In 1979, James B. Marine (petitioner), a partner in an advertising firm, contributed $60,000 in cash for a limited partnership interest in Clark, Ltd. The Clark, Ltd. offering memorandum stated that the partnership had entered into negotiations to acquire the United States Post Office land and building in Jeffersonville, Indiana (the Jeffersonville Post Office), for $545,000, payable by a long-term loan at a maximum interest rate of 4 percent per annum with terms assuring that monthly payments would not exceed monthly partnership income. According to the offering memorandum, the property was leased to the U.S. Government under "a non-cancellable 20 year lease with six 5 year options." Under the lease, the U.S. Government was liable for all utility and housekeeping expenses and taxes. The general partner would be responsible for maintenance and insurance.

The Clark, Ltd. offering memorandum described the method of purchase as follows:

The capital to be contributed by the partners to the partnership is $165,000. The general partner will be allocated $1,650 and the limited partners will be allocated $163,350.

On December 5, 1978 the partnership borrowed $1,388,000 for a 13 month term. This sum has been placed in a non-interest bearing deposit with a long term lending institution which has undertaken to guarantee to the partnership the availability of the sum of $545,000 which is required to complete the purchase referred to above. When the $1,388,000

deposit is returned to the partnership the borrowed $1,388,000 will be repaid to the lender.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

All partners, limited or general, who occupy that position at the time the interest is paid on the $1,388,000 loan, will be entitled to their prorata share of the interest payment made thereon.

Therefore, the partnership has a cash requirement consisting of the interest which is paid on the $1,388,000 loan. The interest expense to the partnership for the year 1979 would be approximately $165,000.

In regard to "Tax Benefits," the limited partnership was a self-described "tax shelter." The Clark, Ltd. offering memorandum discussed and projected the tax advantages of the investment, namely the first-year interest deduction in an amount at least equal to the limited partners' cash contributions. Specifically, it stated that "Terms of the purchase are such that all dollars in the one time investment are written off either because they are shielded by depreciation or interest. The 20-year non-cancellable lease with the United States Government will assure that the investment will perform as shown to provide depreciation write-off and tax shelter." It further stated that the general partner would pay for partnership tax returns, audits, and legal representation at no cost to the partnership.

In 1980 petitioners, through their revocable living trust, contributed $36,000 for a limited partnership interest in Trout, Ltd. According to the Trout, Ltd. offering memorandum, Trout, Ltd. had entered into negotiations to acquire the Sedalia, Missouri, Post Office, both land and building (the Sedalia Post Office), for $1,185,000, payable by a long-term low-interest loan. The Trout, Ltd. offering memorandum indicated that the property was leased to the U.S. Government under terms similar to those described in the Clark, Ltd. offering memorandum. The Trout, Ltd. offering memorandum further stated that the limited partners would contribute a total of $360,000 of capital, of which 1 percent would be allocated to the general partner; that on November 16, 1979, the partnership borrowed $2,856,000 for 13½ months, which sum was deposited interest-free with a lending institution to arrange the $1,185,000 of long-term financing; and that the partnership would use the $360,000 cash to pay interest on the $2,856,000 borrowing. The

Trout, Ltd. offering memorandum was in all other material respects identical to the Clark, Ltd. offering memorandum.

Neither offering memorandum contained an appraisal of the property to be acquired or projections of appreciation or economic profit. Petitioners did not examine a copy of either lease described in the offering memoranda before investing in the partnerships. In deciding to invest in the partnerships, petitioners relied exclusively on the offering memoranda and the advice of a seller of the partnership interests, the treasurer/office accountant of petitioner's advertising firm, and one of the partners in his firm.

The Clark, Ltd. and Trout, Ltd. limited partnership agreements, according to their terms, were to be interpreted under California law.

### The Schulman Partnerships

Clark, Ltd. and Trout, Ltd. are two of some 600 similarly structured limited partnerships organized, promoted, and syndicated by Gerald L. Schulman (Schulman). Schulman was the general partner of each limited partnership. The Schulman partnerships were generally formed for the expressed purpose of acquiring buildings, particularly post offices, under lease to Government entities or utility companies. Schulman promoted the limited partnerships by representing, inter alia, that the partnership would claim an interest deduction in its first year substantially equal to the partners' cash capital contributions. Each first-year interest deduction was actually based upon a circular transfer of funds, more fully described below. Although minor variations existed from year to year, the interest was purportedly paid on an unsecured loan (short-term loan) to the partnerships from a Netherlands or Netherlands Antilles corporation, which amount was purportedly reloaned by the partnership, unsecured and interest free, to a Panamanian corporation. In return for the "interest free deposit," the Panamanian entity would locate a post office or other building to sell to the partnership and provide the partnership with favorable long-term financing (hereinafter long-term notes) usually consisting of no down payment and a 4-percent note for 30 years or more.

Schulman was a client and business associate of Harry Margolis (Margolis), an attorney, from late 1973 to sometime in 1980 or 1981. Margolis and his office were involved in structuring and implementing the circular transfers of funds for Schulman. Margolis structured the transactions through the use of various domestic and foreign entities that he controlled known as the "System." The System entities included, among others, Hexagram, a Netherlands Antilles corporation, and Parallax, S.A. of Panama. Generally, Margolis would deposit at a bank a given sum of money (a "collected fund"); by "spinning" the deposit on a single day through multiple accounts in the names of System entities, he would effect a succession of offsetting banking entries. The entries were reflected in bank records that on their face indicated amounts of transactions far exceeding the collected fund. The bank records would later be used in an attempt to substantiate nonexistent transactions.

Schulman used the Margolis System to conduct ostensible transactions in an attempt to create records of nonexistent large short-term borrowings and payment of interest thereon for the Schulman partnerships. On October 31, 1978, a total of $95,225,000 moved around a circle as follows: Banco de Iberoamerica (Banco) of Panama lent the sum to Hexagram for 1 year at 9.75-percent interest; Hexagram then made 1-year loans aggregating the same sum at the same interest rate to 55 Schulman partnerships; said partnerships then lent the same aggregate sum to Parallax for 1 year interest free; Parallax then transferred the same sum to Banco with instructions to credit the account of Hexagram. The bank account of each of those parties was the same nominal amount at the beginning and end of the day. On December 5, 1978, circular money movements aggregating $157,233,000 were made in the same manner involving 36 Schulman partnerships, including Clark, Ltd. The aggregate of money movements involving the 91 Schulman partnerships was thus $252,458,000.

On December 27, 1979, the $252,458,000 was circulated in the opposite direction; that is, Parallax received that sum from Island Bank, repaid it to the 91 Schulman partnerships, which repaid it to Hexagram, which repaid Island

Bank. The illusion of payment of 9.75-percent interest by the partnerships was created by circulating $28,105,435.49 from Hexagram to the 91 partnerships via a Schulman special account; and from the 91 partnerships to Hexagram, all on December 27, 1979. These sums moved via accounts at Barclays-Kol of the Netherlands. The above-described money movement is typical and representative for each Schulman partnership, including Trout, Ltd.

The Clark, Ltd. transactions involved a purported 10-percent, 13-month short-term loan on December 5, 1978, of $1,388,000 from Hexagram to Clark, Ltd., which sum was purportedly placed interest-free and unsecured for 1 year with Parallax. The deposit was purportedly returned to Clark, Ltd. and repaid to Hexagram in December 1979, together with interest.

The Trout, Ltd. transactions involved a purported 10-percent, 13½-month, unsecured short-term loan on November 16, 1978, of $2,856,000 from Terla, B.V., a Netherlands corporation, to Trout, Ltd., which sum was purportedly placed interest-free and unsecured for 1 year with Sinueri, S.A., a Panamanian corporation. The deposit with Sinueri was purportedly returned by Desarollo Monteverde, S.A., a Panamanian corporation, to Trout, Ltd., which was then purportedly repaid together with interest to Alquan, B.V., a Netherlands corporation, on December 31, 1979. No records have been produced to disclose how, if at all, Desarollo Monteverde and Alquan were substituted for or purportedly succeeded to the interest of Sinueri and Terla, respectively.

The Schulman partnerships, including Clark, Ltd. and Trout, Ltd., did not make the large short-term loans and did not pay interest thereon. The circular money movements, designed by Schulman to simulate such transactions, were shams.

Through his employees, Schulman controlled the initial purchases of the post offices and other real properties by various Panamanian corporations and the subsequent re-sales to the Schulman partnerships. Generally, Philip November (November) represented the Panamanian corporations in negotiating the initial purchases at arm's length with the original owners. November was Schulman's brother-in-law and employee beginning in 1978. His compen-

sation was salary paid by Schulman and commissions from the Panamanian corporations. At first, the Panamanian corporations granted November a power of attorney to purchase the real estate for resale to the Schulman partnerships. Subsequently, such corporations appointed November, at his request, vice president to expedite the purchases of the real estate. The initial purchases were financed through the use of escrow accounts. After acquiring the property, November would execute documents prepared by Schulman's office that conveyed title to the property from the Panamanian corporation to the Schulman partnership at predetermined sales prices. The resale price of each property, calculated using a formula of 18 times annual lease rentals, substantially exceeded the price at which November negotiated the initial purchase.

Of the annual rent due under the existing lease on property to be acquired by a Schulman partnership, 85 percent was to be allocated to servicing the long-term note and 15 percent was to be paid usually to Postal Management Service Co. (PMSC) for managing the real estate and paying the lessor's obligations. PMSC was a sole proprietorship of Schulman.

### The Jeffersonville Post Office

Clark, Ltd. purportedly bought the Jeffersonville Post Office land and building from Cualquier, S.A., a Panamanian corporation, with no downpayment and a $545,000, 42-year note dated December 18, 1979, at a rate not to exceed 4 percent per annum. The deed from Cualquier to Clark, Ltd. was recorded December 18, 1979. Cualquier purchased the Jeffersonville Post Office on December 18, 1979, for $315,000, consisting of $74,000 in cash, $151,800 in existing debt, and $89,200 in new debt.

An amortization schedule prepared in regard to the Clark, Ltd. long-term note charted the amortization in relevant part as follows:

| No. | Payment date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| | Principal amount | | | $545,000.00 | |
| | Interest rate | | | 4.00% per year | |
| | Terms | | | 20 years, 1 month | |
| | Regular monthly payment | | | $2,120.00 | |

| No. | Payment date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 1 | FEB 1 80 | $2,120.00 | $1,816.49 | $303.51 | $544,696.49 |
| 64 | MAY 1 85 | 2,120.00 | 1,745.70 | 374.30 | 523,387.73 |
| 124 | MAY 1 90 | 2,120.00 | 1,662.99 | 457.01 | 498,489.47 |
| 184 | MAY 1 95 | 2,120.00 | 1,562.00 | 558.00 | 468,089.41 |

| No. | Payment date | Payment | Allocation | | Balance |
|---|---|---|---|---|---|
| | | | *Interest* | *Principal* | |
| | | Principal amount | | $433,683.43 | |
| | | Interest rate | | 3.00% per year | |
| | | Terms | | 5 years, 1 month | |
| | | Regular monthly payment | | $2,120.00 | |
| 4 | MAY 1 00 | $2,120.00 | $1,076.42 | $1,043.58 | $429,524.70 |

| No. | Payment date | Payment | Allocation | | Balance |
|---|---|---|---|---|---|
| | | | *Interest* | *Principal* | |
| | | Principal amount | | $366,722.94 | |
| | | Interest rate | | 2.00% per year | |
| | | Terms | | 17 years, 1 month | |
| | | Regular monthly payment | | $2,120.00 | |
| 4 | MAY 1 05 | $2,120.00 | $603.41 | $1,516.59 | $360,671.69 |
| 64 | MAY 1 10 | 2,120.00 | 444.11 | 1,675.89 | 264,897.07 |
| 123 | MAY 1 15 | 2,120.00 | 268.08 | 1,851.92 | 159,062.75 |
| 205 | FEB 1 22 | 460.72 | 0.77 | 459.95 | .00 |

The Jeffersonville Post Office was built and leased to the U.S. Government in 1965. The 20-year basic lease term was scheduled to expire on April 30, 1985. Annual rent during the basic term of the lease, as amended on January 1, 1968, was $30,200. The lease required the lessor to maintain and repair the leased premises and to furnish heating and air conditioning equipment; it required the U.S. Government to pay property taxes and utility expenses. It granted the U.S. Government the right to sublet and to assign the lease. Upon expiration of the basic term, the amended lease granted the U.S. Government six separate, consecutive options to renew the lease for 5-year terms at the following annual rentals:

| Term | Beginning date of term | Amount |
|---|---|---|
| First renewal term | May 1, 1985 | $29,000 |
| Second renewal term | May 1, 1990 | 20,000 |
| Third renewal term | May 1, 1995 | 17,500 |
| Fourth renewal term | May 1, 2000 | 17,500 |
| Fifth renewal term | May 1, 2005 | 17,500 |
| Sixth renewal term | May 1, 2010 | 17,500 |

The lease also granted the U.S. Government the options to purchase the fee simple title to the leased premises, including the underlying land, at the following respective times and prices:

| Term | Date | Amount |
|---|---|---|
| End of basic lease term | Apr. 30, 1985 | $450,000 |
| End of first renewal term | Apr. 30, 1990 | 400,000 |
| End of second renewal term | Apr. 30, 1995 | 350,000 |
| End of third renewal term | Apr. 30, 2000 | 350,000 |
| End of fourth renewal term | Apr. 30, 2005 | 350,000 |
| End of fifth renewal term | Apr. 30, 2010 | 350,000 |
| End of sixth renewal term | Apr. 30, 2015 | 350,000 |

Clark, Ltd. acquired the Jeffersonville Post Office subject to the lease.

In a written maintenance, insurance, and guaranty Agreement between PMSC and Clark, Ltd., PMSC agreed to perform all of Clark Ltd.'s obligations as lessor under the Jeffersonville Post Office lease, to insure the property, and to collect rents and other payments due to Clark, Ltd. The effective date of the agreement was December 18, 1979, although it was executed by Schulman, for both Clark, Ltd. and PMSC, on August 5, 1982. The initial term of the management agreement ran through January 1, 1989, and was to continue thereafter until terminated by either Clark, Ltd. or PMSC. Clark, Ltd. agreed to pay PMSC as compensation $1,324 by December 31, 1979, $7,049 for 1980, and $4,760 for each year thereafter. PMSC guaranteed to distribute to Clark, Ltd.'s limited partners annually until January 1, 1989, amounts equal to 2 percent of their initial capital contribution. Petitioner actually received a $1,140 cash payment from Schulman each year from 1980 through 1982.

### The Sedalia Post Office

Trout, Ltd. purportedly bought the Sedalia Post Office from Picaro, S.A., a Panamanian corporation, for no down payment and a $1,185,000, 45-year note dated May 31, 1980, at a rate not to exceed 4-percent per annum. The deed from Picaro to Trout, Ltd. was dated May 30, 1980, and recorded August 25, 1980. Intervening record title to the Sedalia Post Office passed to Seabright Land Corp., an entity controlled by Margolis, which functioned merely to

hold title and facilitate planned transfers between Margolis entities. Piedra, S.A., a Panamanian corporation, acquired the Sedalia Post Office land and building on or about December 26, 1979, for $587,000, consisting of cash of $70,000 and an existing debt of $517,000.

An amortization schedule prepared for the Trout, Ltd. long-term note indicated in relevant part the following:

| No. | Payment date | Payment | Allocation Interest | Principal | Balance |
|-----|-----|-----|-----|-----|-----|
| | Principal amount | | | $1,185,000.00 | |
| | Interest rate | | | 4.00% per year | |
| | Terms | | | 20 years, 1 month | |
| | Regular monthly payment | | | $4,445.00 | |
| 1 | JUL 1 80 | $4,445.00 | $3,949.61 | $495.39 | $1,184,504.61 |
| 101 | NOV 1 88 | 4,445.00 | 3,754.03 | 690.97 | 1,125,629.72 |
| 161 | NOV 1 93 | 4,445.00 | 3,601.34 | 843.66 | 1,079,666.66 |
| 221 | NOV 1 98 | 4,445.00 | 3,414.92 | 1,030.08 | 1,023,547.11 |

| No. | Payment date | Payment | Allocation Interest | Principal | Balance |
|-----|-----|-----|-----|-----|-----|
| | Principal amount | | | $1,003,309.93 | |
| | Interest rate | | | 3.00% per year | |
| | Terms | | | 5 years, 1 month | |
| | Regular monthly payment | | | $4,445.00 | |
| 41 | NOV 1 03 | $4,445.00 | $2,304.85 | $2,140.15 | $919,801.76 |

| No. | Payment date | Payment | Allocation Interest | Principal | Balance |
|-----|-----|-----|-----|-----|-----|
| | Principal amount | | | $878,107.02 | |
| | Interest rate | | | 2.00% per year | |
| | Terms | | | 20 years | |
| | Regular monthly payment | | | $4,445.00 | |
| 41 | NOV 1 08 | $4,445.00 | $1,257.61 | $3,187.39 | $751,678.48 |
| 101 | NOV 1 13 | 4,445.00 | 922.82 | 3,522.18 | 550,390.97 |
| 161 | NOV 1 18 | 4,445.00 | 552.87 | 3,892.13 | 327,961.30 |
| 240 | JUN 1 25 | 3,520.74 | 5.86 | 3,514.88 | .00 |

The Sedalia Post Office building was built and leased in 1968 to the U.S. Government for a 20-year basic term ending October 31, 1988. The lease required annual rent of $65,846 in equal monthly installments. Upon the expiration of the original term, the lease provided the U.S. Government six separate, consecutive 5-year options to renew the lease at the following annual rentals:

| Term | Beginning date of term | Amount |
|---|---|---|
| First renewal term | Nov. 1, 1988 | $66,725 |
| Second renewal term | Nov. 1, 1993 | 66,725 |
| Third renewal term | Nov. 1, 1998 | 65,846 |
| Fourth renewal term | Nov. 1, 2003 | 65,846 |
| Fifth renewal term | Nov. 1, 2008 | 65,846 |
| Sixth renewal term | Nov. 1, 2013 | 65,846 |

The lease also granted the U.S. Government purchase options on the post office building and land at the following respective times and prices:

| Term | Date | Amount |
|---|---|---|
| End of basic lease term | Oct. 31, 1988 | $850,000 |
| End of first renewal term | Oct. 31, 1993 | 850,000 |
| End of second renewal term | Oct. 31, 1998 | 850,000 |
| End of third renewal term | Oct. 31, 2003 | 830,000 |
| End of fourth renewal term | Oct. 31, 2008 | 815,000 |
| End of fifth renewal term | Oct. 31, 2013 | 800,000 |
| End of sixth renewal term | Oct. 31, 2018 | 790,000 |

Under the terms of the lease, the lessor agreed to maintain and repair the premises and to furnish heating and air conditioning equipment. The U.S. Government agreed to pay for all utilities and property taxes and was entitled to sublet or assign the lease. Trout, Ltd. acquired the Sedalia Post Office subject to this lease.

Trout, Ltd. and PMSC executed a maintenance, insurance and guaranty agreement "effective as of May 31, 1980," whereby PMSC agreed to manage and insure Trout, Ltd.'s property. Trout, Ltd. agreed to pay PMSC during the initial term of the agreement $19,879 by December 31, 1980, and $12,506 per annum thereafter. The initial term of the management agreement was to end January 1, 1986, and was to be renewed at terms to be mutually agreed upon by Clark, Ltd. and PMSC. PMSC guaranteed to distribute to the limited partners of Trout, Ltd. each year during the initial term sums equal to 2 percent of their initial capital contribution. Petitioners actually received from Schulman $760 in each of 1981 and 1982.

On January 6, 1982, Trout, Ltd. and the U.S. Postal Service (Postal Service) amended the lease whereby the Postal Service assumed full responsibility of maintaining

the post office in tenantable condition. Trout, Ltd. retained responsibility for all structural and other repairs to the premises. As a condition to the agreement, Trout, Ltd. agreed to perform numerous one-time items of deferred maintenance. In further consideration, Trout, Ltd. agreed to reduce the annual rent to $60,643 during the basic term, $61,453 during the first and second renewal terms, and $60,643 during the remaining four renewal terms.

## Domestication of the Long-Term Notes and Use as Collateral

In March 1982, Schulman consulted Gloria Felcyn, an accountant, and Sheldon Sisson, an attorney, both former employees of Margolis, on the economic and Federal income tax implications of transferring ownership of the Schulman partnership long-term notes from the foreign entities to domestic trusts. Subsequently, all of the long-term notes were assigned to two grantor trusts organized under California law, the 1518 Trust and 1167 Trust (the trusts), of which Schulman was both trustee and beneficiary.

Schulman, individually and/or through the trusts, used the long-term notes and security mortgages on the partnerships' properties as collateral to obtain a $10-million, 78-month loan from Mitsui Manufacturers Bank (Mitsui) in 1983; a $22.5-million, 120-month loan from FCA Credit Corp. (FCA) in 1984; and a $77.7-million, 211-month loan from Drexel Burnham Lambert, Inc. (Drexel) in 1985.

Each of the loan agreements contained comprehensive protective provisions for the lender. The collateral for the FCA loan primarily included 480 long-term notes, security mortgages issued by the partnerships to the trusts, rents due under the leases on the 480 parcels of property, and management fees owed to PMSC by the Schulman partnerships. Schedules showed the original face amounts of the long-term notes being $492,598,000. Under the terms of the Drexel loan agreement, the proceeds were first to be applied toward discharging the loans from Mitsui, FCA, and other lenders, whose collateral was to be assigned back to the borrower and then to Drexel. The collateral provided for the Drexel loan included primarily 519 long-term notes and first lien security mortgages on the same number of partnership

properties and at least 90 percent of all lease rents on the properties.

## Criminal and Civil Suits

Pursuant to a first superseding indictment dated June 1985, Schulman was charged with 20 counts of conspiracy, making or subscribing a false tax return or document under section 7206(1), and aiding in the preparation of a false tax return or document under section 7206(2). The charges arose from his promotion and administration of the scheme to generate ostensible interest deductions for various Schulman partnerships by circular financing. Schulman was also indicted on 5 perjury counts. On February 12, 1988, the U.S. District Court for the Central District of California found Schulman guilty on the conspiracy and tax fraud counts.

In 1987 and 1988, a civil action in which petitioners were named plaintiffs, *Adams, et al. v. Alameda Investors, Inc., et al.,* Civ. 87-4386 (N.J.) (Adams), and two class action suits on behalf of Schulman partnership investors, *Morguelan, et al. v. Schulman, et al.,* 87 Civ. 7736 (S. N.Y.) (Morguelan) and *Reynolds, et al. v. Postal Management Services Co., et al.,* 88-1546 (E. Pa.) (Reynolds), were filed in Federal District Courts against Schulman and various defendants who were involved in the Schulman partnership transactions. The suits were pending at the time of trial of this case in July 1988. In each suit numerous defendants were named, and the relief requested included return of all moneys paid by plaintiffs plus compensatory, punitive, and treble damages.

The Morguelan complaint alleged in relevant part:

In addition to the false representations, Defendants failed to disclose material facts known to Defendants about the investments, including among others:

(a) that the properties were purchased by the Schulman partnerships at inflated prices, and were worthless to the partnerships because they were leveraged with debt beyond their fair market value;

(b) that the first year loan transactions allegedly entered into by the Schulman partnerships were sham transactions that had no economic substance;

(c) that Plaintiffs by virtue of the inflated values and lack of economic substance in the transactions, would be subjected to interest and penalties for tax deficiencies; and

\*  \*  \*  \*  \*  \*  \*

(e) that the third parties responsible for delivering the properties to the partnership were controlled by Schulman.

(f) that Schulman placed second mortgages on the properties and directly or indirectly received interest paid on such mortgages.

It also alleged that the plaintiffs were unaware of and could not have reasonably discovered such facts until shortly before October 1987.

The Adams complaint asserted that the Schulman partnerships were marketed as tax shelters. The complaint further alleged in relevant part:

27. Although there were slight variations in the formal structure of the Schulman partnerships in some cases, the fraudulent scheme of creating sham transactions, and unsupportable interest deductions, was common to all of the limited partnerships created by Schulman. In addition, with respect to each of the Schulman partnerships, the Private Placement Memoranda, and other written Offering Materials misrepresented the following facts:

A. That the terms of the partnership purchase transactions were such that the limited partners' initial partnership investment was completely deductible, for tax purposes, in the year it was made, because of interest and maintenance payments to be made by the partnership, and depreciation deductions;

B. The non-cancellable leases with federal and state governments, or public utility companies, assured that there would be sufficient case [sic] to satisfy the partnerships' cash flow obligations;

C. There was no risk of a loss of partnership property through foreclosure;

D. All partnership returns, tax audits, and representation up to and including the United States Tax Court would be provided by the General Partner, at no additional cost to the investor;

E. The partnerships had entered into short-term loans, in the year of their creation for which they were entitled to legitimate, short-term interest deductions;

F. The Limited Partners would receive cash flow on their investments, in the amount of 2% per year, for the first five years after their investment was made;

G. A build-up of equity in partnership properties would occur as mortgages were amortized;

H. The Limited Partners' investment funds would be totally recovered through tax savings, and cash flow over a period of five years;

28. The Offering Materials and Private Placement Memoranda were also false and misleading in that they failed to disclose, among other things:

A. That there was no reasonable possibility of economic gain for the investors, and it was, for all practical purposes, impossible for any limited partner to recoup his cash investment or to even realize any return of a significant portion of that investment;

B. The property purchase transactions utilized a fraudulent scheme of "circular financing", and were in reality sham transactions, devoid of economic substance;

C. The properties purchased by the Schulman partnerships were purchased at prices inflated from 70% to 100% above their true market value;

D. There were lease-purchase options which provided for purchase of the partnership properties by the tenants in these properties, at prices far below what was paid for the properties by the partnerships themselves, in many cases;

\* \* \* \* \* \* \*

F. There were underlying mortgages on the properties purchased by the partnerships, the payment of which was not secured by rental income, and which posed a significant risk of loss of these properties through foreclosure;

\* \* \* \* \* \* \*

H. Partnership properties were purchased with financing far in excess of their true market values, resulting in zero equity for the limited partners, as soon as their investments were made;

I. The Schulman partnerships would be treated for all intents and purposes, as part and parcel of a unified investment scheme, with comingling of funds and obligations between partnerships, and the failure to adequately maintain separate financial records for each separate partnership;

J. It was the intention of defendant Schulman to obtain large sums of money by pledging partnership properties, and partnership leases, as security for these funds, and to apply such monies, at least in part, for his own personal enrichment.

The Adams complaint further alleged that the plaintiffs were unaware of and could not reasonably have discovered such facts prior to June 1987.

The Reynolds complaint asserted, among other things, that the offering memoranda and materials stressed the tax benefits to the investors, that the loan transactions did not exist, and that the plaintiffs and the class members were unaware of and could not reasonably have discovered the alleged facts until after the Internal Revenue Service and the Justice Department had exhaustively investigated the

defendants, culminating in Schulman's criminal conviction in February 1988.

### Tax Treatment

On their partnership returns, Forms 1065, for the years in issue, Clark, Ltd. and Trout, Ltd. reported the following losses:

| Clark Ltd. | 1979 | | 1980 | |
|---|---|---|---|---|
| Gross rents | | $1,090 | | $30,200 |
| Depreciation | $20,999 | | $41,997 | |
| Insurance and maintenance | 1,325 | | 7,049 | |
| Interest | 163,676 | | 20,745 | |
| Total expenses | | 186,000 | 69,791 | |
| Income (Loss) | | (184,910) | | (39,591) |

| Clark Ltd. | 1981 | | 1982 | |
|---|---|---|---|---|
| Gross rents | | $30,200 | | $30,200 |
| Depreciation | $41,997 | | $41,997 | |
| Insurance and maintenance | 4,760 | | 4,760 | |
| Interest | 21,592 | | 21,435 | |
| Total expenses | | 68,349 | 68,192 | |
| Income (Loss) | | (38,149) | | $(37,992) |

| Trout, Ltd. | 1980 | | 1981 | | 1982 | |
|---|---|---|---|---|---|---|
| Gross receipts | | $38,409 | | $65,846 | | $65,845 |
| Depreciation | $91,315 | | $91,315 | | $91,315 | |
| Insurance and maintenance | 19,879 | | 12,506 | | 12,505 | |
| Interest | 371,088 | | 47,163 | | 46,911 | |
| Total expenses | | 482,282 | | 150,984 | | 150,731 |
| Income (Loss) | | (443,873) | | (85,138) | | (84,886) |

Petitioners claimed on their income tax returns, and respondent disallowed in his deficiency notice, their distributive shares of the partnerships' losses, as follows:

| | Clark, Ltd. | | Trout, Ltd. | |
|---|---|---|---|---|
| | % Share | Amount | % Share | Amount |
| 1979 | 34.43 | $63,664 | --- | --- |
| 1980 | 36.00 | 14,252 | 8.74 | $38,783 |
| 1981 | 36.00 | 13,733 | 9.90 | 8,428 |
| 1982 | 36.00 | 13,676 | 9.90 | 8,404 |

By amendment to answer, respondent asserted an addition to tax under section 6653(a) for each year in issue, an

increased addition to tax under section 6661, and additional interest under section 6621(c).

## OPINION

Preliminarily, petitioners argue that respondent's notice of deficiency should not be afforded the usual presumption of correctness and that respondent should bear the burden of production of evidence in this case. In support of their argument, petitioners allege that the Commissioner possessed the critical evidence for this case as a result of his investigation of Schulman for criminal tax fraud, that respondent had such evidence before or at the time the deficiency notices were mailed to the limited partners of the Schulman partnerships, that he knew or should have known that the limited partners were unaware of Schulman's criminal activities, and that he failed to disclose such evidence until petitioners had begun preparing for the trial of this case. Petitioners state that respondent issued the deficiency notice "in disregard of his own concealed evidence that Petitioners had, indeed, suffered deductible losses at the hands of [Schulman]," and cite *Scar v. Commissioner*, 814 F.2d 1363, 1375 (9th Cir. 1987) (Hall, J. dissenting), revg. 81 T.C. 855 (1983); *Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977); *Jackson v. Commissioner*, 73 T.C. 394, 401 (1979). Petitioners further argue, without citing authority, that the Internal Revenue Service, "owes a duty to innocent taxpayers like Petitioners, to reveal to them crucial evidence known only to IRS."

Our decision in this case is unaffected by the burden of going forward or the burden of proof because the stipulated facts establish the nature of the transactions in issue. In any event, petitioners' assertions have no merit. See *Finkelman v. Commissioner*, T.C. Memo. 1989-72.

## *Theft Loss*

Petitioners concede that the partnerships' short-term loans were shams, the effect being that their initial year "interest expenses" claimed on the short-term loans, in the amount of their cash contributions, are not allowable as

such. Petitioners now argue, however, that those amounts were deductible as theft losses under section 165(c)(3) on the ground that Schulman embezzled or fraudulently appropriated the limited partners' cash contributions.

Section 165 generally allows a taxpayer to deduct losses arising from the theft of property. Sec. 165(a), (c)(3). For purposes of this statute, "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Sec. 165(e). This discovery rule is unique under section 165, the purpose being that the victim may not become aware of the theft loss until years after its occurrence.

The parties sharply disagree over when petitioners discovered the alleged theft loss. Respondent argues that petitioners did not discover the theft loss during any of the years before the Court.

Although petitioners consistently admit that they first learned about the "theft" in 1987 or 1988, petitioners maintain that they knew of, and accordingly may deduct, the loss of their cash contributions to Clark, Ltd. and Trout, Ltd. in 1979 and 1980, respectively, the initial years of each partnership. Petitioners explain on brief:

S [Schulman], the general partner, advised them to expect it, reflected it in the partnership return and K-1 sent to the Marines for each initial year. He represented that it would result from payment of interest on a large short term loan, which he simulated by circular money movements via off-shore entities. There was no such loan or interest payment. Actually S spent the cash for non-partnership purposes which the record in this case demonstrates to have constituted embezzlement.

Petitioners argue that, under the express language of section 165(e), it is the discovery of the loss, rather than the discovery of the theft, that controls the timing of the theft loss deduction. Petitioners contend that the relevant legislative history, income tax regulations, and case law also describe the deduction as allowable in the year of discovery of the "loss," and cite H. Rept. 1337, 83d Cong, 2d Sess., 21, A46 (1954); sections 1.165-1(d)(3) and 1.165-8(a), Income Tax Regs.; *Rainbow Inn, Inc. v. Commissioner*, 433 F.2d 640 (3d Cir. 1970), revg. a Memorandum Opinion of this Court; *Ramsay Scarlett & Co. v. Commissioner*, 61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975); *Lary v. United*

*States,* 608 F. Supp. 258 (N.D. Ala. 1985), affd. 787 F.2d 1538 (11th Cir. 1986).

Petitioners misinterpret the language of section 165(e) and the authority that tracks that language. It is the discovery of the *theft* loss, and not a mere claim to one of the other losses enumerated under section 165, that entitles the taxpayer to the theft loss deduction. Until knowledge of both theft and loss coexist, a theft loss deduction is untenable. Those conditions did not arise in this case during any of the years before the Court.

One of the cases relied on by petitioners, *Lary v. United States,* 608 F. Supp. at 261, directly supports our conclusion, with the court stating:

However, in the circumstances of this case, the Court is convinced that no reasonable interpretation of Section 165(e) would allow plaintiffs to take a theft loss deduction in 1975 or 1976. The relevant year is not the year in which a business "loss" is incurred or reflected on the books of a business, but the year in which a *"theft* loss" is discovered. Clearly, that year was some year other than 1975 or 1976 insofar as we are concerned here.

The other cases cited by petitioners, *Ramsay Scarlett & Co. v. Commissioner, supra,* and *Rainbow Inn, Inc. v. Commissioner, supra,* are distinguishable because they dealt with the issue of whether a reasonable prospect of recovery existed in the year the theft loss was discovered. This question is addressed below.

In various filings in this case, petitioners have argued that the general partner's knowledge of his theft in the initial year of investment should be imputed to the limited partners, even though the limited partners were not personally aware of the theft until several years after the theft occurred. Thus, petitioners have argued that they may deduct a theft loss in the initial year of investment because the partnership "discovered" the theft loss in that year. Respondent argues that a limited partner can deduct a theft loss only in the taxable year in which the limited partner personally discovers it, even though the general partner was aware of the theft in earlier years.

We agree with respondent. When a general partner embezzles funds, he is not acting in his capacity as a partner; he has no authority to steal. Accordingly, the

partnership is able to deduct the theft loss as if a nonpartner had committed the embezzlement. Because the general partner is not acting in his capacity as a partner, the knowledge of the general partner is not imputed to the partnership.

This result is in accordance with the general rule and California law that a general partner has no authority to do any act in contravention of the certificate of limited partnership. Cal. Corp. Code sec. 15509(1)(a) (West 1977); Revised Uniform Limited Partnership Act sec. 403 (1976). In addition, the general partner violates his fiduciary duties of loyalty and due care, which he owes to each limited partner, if he embezzles funds that each limited partner contributed for partnership purposes. *Richards v. Frazer*, 122 Cal. 456, 55 P. 246, 247 (1898); *McGlynn v. Schultz*, 90 N.J. Super. 505, 218 A.2d 408 (1966), affd. 95 N.J. Super. 412, 231 A.2d 386 (1967). Because the Revised Uniform Limited Partnership Act does not specifically deal with this question, the provisions of the Uniform Partnership Act govern. See Cal. Corp. Code sec. 15722 (West Supp. 1988). Section 12 of the Uniform Partnership Act, Cal. Corp. Code sec. 15012 (West 1977), provides the following:

Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, *except in the case of a fraud on the partnership committed by or with the consent of that partner.* [Emphasis supplied.]

The legislative history of section 165(e) also supports the conclusion that the knowledge of the general partner concerning his theft should not be imputed to the limited partners for purposes of this section. When enacting section 165(e), Congress recognized that, in embezzlement and other theft loss situations, the taxpayer may not find out about the loss until the statute of limitations had run for the year in which the loss was incurred. H. Rept. 1337, 83d Cong., 2d Sess. 21 (1954). Accordingly, section 165(e) was enacted to allow a taxpayer a theft loss deduction only in the year he discovered the theft loss. *Asphalt Industries, Inc. v. Commissioner*, 411 F.2d 13, 15 (3d Cir. 1969), affg. 46 T.C.

622 (1966). If the general partner's knowledge of the theft loss is imputed to the limited partners in the year the theft took place, it is foreseeable that many limited partners would be denied a theft loss because the period of limitations has expired. This result is unsupported by the legislative history and contravenes the very objective Congress sought to achieve.

Petitioners did not discover the alleged theft loss during any year in issue. In any event, we do not believe that petitioners were victims of a theft.

The evidence does not support a holding that Schulman fraudulently appropriated petitioners' money or intended to deprive them of it unlawfully. Petitioners relied primarily on the offering memoranda for Clark, Ltd. and Trout, Ltd. in deciding to invest in the partnerships. These memoranda indicated that each partnership was to purchase post office realty at a specified price and that certain tax benefits would be generated by the investment. The memoranda further stated that the limited partners' initial cash contribution would be entirely absorbed in paying interest on certain short-term notes, the funds from which were to be provided interest-free for a limited period to a Panamanian entity whose only consideration was to locate and acquire the post office realty for resale and to provide each partnership long-term purchase financing. The memoranda did not represent that the partnerships would use the cash contributions to make downpayments on the acquired realty or that the generated "interest payment" would withstand Internal Revenue Service scrutiny.

Petitioners received exactly what they bargained for—title to a post office building with no downpayment and claims to tax deductions greatly exceeding their cash investment. They cannot now persuade us that Schulman fraudulently appropriated the partnerships' funds or that he unlawfully deprived petitioners of their property.

The State court cases primarily relied on by petitioners are distinguishable. In *People v. Sobiek,* 30 Cal. App. 3d 458, 106 Cal. Rptr. 519 (1973), a group of individuals formed a partnership and pooled their money for the purpose of investing in second mortgages. The evidence in that case, indicating that one partner appropriated to his

own use considerable sums of the partnership's money, supported an indictment of the partner on grand theft. In *People v. Pierce,* 110 Cal. App. 2d 598, 243 P.2d 585 (1952), the defendant induced investors to deposit funds for an investment in a franchise, but then misappropriated the funds for his own business. In the instant case, by contrast, petitioners gave their cash to the general partner for investments in limited partnerships and for questionable tax deductions. Petitioners acquired limited partnership interests and have made claims to the tax deductions. Petitioners have not proven that the losses were contrary to their expectations.

Petitioners' reliance on *Nichols v. Commissioner,* 43 T.C. 842 (1965), is therefore also misplaced. In *Nichols,* the taxpayers invested in a scheme that promised large income tax deductions to be derived from trading in Government bonds. We found that the taxpayers bargained for a transaction in which there would be real purchases of bonds from which they could at least argue for their claimed tax benefits. Because no bonds were in fact purchased, we held that the taxpayers were thus entitled to their claimed theft loss. 43 T.C. at 886.

Rather, this case closely parallels *Viehweg v. Commissioner,* 90 T.C. 1248 (1988). In *Viehweg,* the taxpayers purchased interests in certain limited partnerships designed to secure tax deductions. In two opinions of this Court, the tax deductions claimed on identical investments were disallowed because the purported investments were shams. *Julien v. Commissioner,* 82 T.C. 492 (1984); *Glass v. Commissioner,* 87 T.C. 1087 (1986), affd. sub nom. *Herrington v. Commissioner,* 854 F.2d 755 (5th Cir. 1988), affd. sub nom. *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir. 1988), affd. sub nom. *Ratliff v. Commissioner,* 865 F.2d 97 (6th Cir. 1989), affd. sub nom. *Kirchman v. Commissioner,* 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. *Keane v. Commissioner,* 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. *Killingsworth v. Commissioner,* 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. *Friedman v. Commissioner,* 869 F.2d 785 (4th Cir. 1989), affd. sub nom. *Dewees v. Commissioner,* 870 F.2d 21 (1st Cir. 1989). The taxpayers in *Viehweg* argued that they were entitled to theft loss deductions on

their out-of-pocket "investments." We held that the taxpayers failed to prove that they suffered a loss from theft.

Petitioners have also failed to demonstrate that there was no reasonable prospect of recovering their cash contributions in the initial years of the partnerships. At the time of trial of this case, petitioners were named plaintiffs in one lawsuit and qualified as class members in at least two class action suits against Schulman and other defendants. The relief requested in each lawsuit included compensatory and punitive damages. If in the year of the discovery of the loss there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then there is no closed and completed transaction fixed by identifiable events and thus no deductible loss. Secs. 1.165-8(a)(2) and 1.165-1(d), Income Tax Regs.; *Dawn v. Commissioner,* 675 F.2d 1077 (9th Cir. 1982); *Viehweg v. Commissioner,* 90 T.C. at 1255-1256.

### Partnership Losses

Respondent challenges the deductibility of petitioners' distributive shares of the partnerships' losses on the grounds that (1) the partnerships' transactions lacked any business purpose and were economic shams, (2) the partnerships' activities were "not engaged in for profit" under section 183, rendering petitioners' deductions for depreciation and operating expenses allowable to the extent provided by section 183(b), and (3) the partnerships' long-term notes were shams and did not constitute genuine indebtedness for tax purposes.

In each of the years in issue, a substantial portion of each partnership's reported expenses was attributable to deductions for depreciation and interest. To be deductible, depreciation must be based on an actual or bona fide investment in property, *Narver v. Commissioner,* 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982); and interest must be paid on genuine indebtedness. *Knetsch v. United States,* 364 U.S. 361 (1960); *Beck v. Commissioner,* 74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982). If the purchase price and the principal amount of a nonrecourse note unreasonably exceed the value of the underlying security, no "investment in the property" occurs, and no "genuine

indebtedness" exists. *Estate of Franklin v. Commissioner,* 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975).

*Estate of Franklin* involved the deductibility of interest and depreciation payments claimed with respect to a motel purchased by a limited partnership. The partnership agreed to purchase the motel for $1,224,000 and lease it back to the sellers. This purchase price was to be paid under a 10-year nonrecourse obligation requiring $75,000 in prepaid interest at the time of sale, monthly installments of principal and interest approximately equal in sum to the monthly rent due under the lease, and a large balloon payment at the end of the period. Except for the prepayment of interest, no cash was to pass between the sellers and the partnership until the balloon payment.

The Court of Appeals stated that the characteristics of the transaction could exist in a situation where the sale would impose on the purchaser a genuine indebtedness which would support both interest and depreciation deductions. Nevertheless, the court's test in determining whether the transaction had economic substance was whether the purchase price was at least approximately equivalent to the fair market value of the property. The court held that the taxpayer's failure to prove such equivalence was therefore fatal to its case. The court explained:

An acquisition such as that of * * * [taxpayers] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. [544 F.2d at 1048.]

In regard to the interest deduction, the court stated that although interest on a nonrecourse debt could be deductible, such is not the case where it appears that "the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged. " 544 F.2d at 1049. The court added:

To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an

economic point of view for him to make a capital investment in the amount of the unpaid purchase price. [544 F.2d at 1049.]

A similar analysis is appropriate here, particularly considering that each partnership's long-term nonrecourse note amounted to the entire purchase price of its post office. The relevant evidence compels the conclusion that the principal amount of each partnership's long-term nonrecourse note substantially exceeded the fair market value of the post office on the date of purchase.

Fair market value has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. *United States v. Cartwright* 411 U.S. 546, 551 (1973). This generally accepted definition of fair market value assumes that buyer and seller are separate and distinct entities having adverse economic interests. *Narver v. Commissioner,* 75 T.C. 53, 96 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Applying these principles to the case at hand, the prices at which the partnerships purchased the post offices are not persuasive evidence of fair market value because Schulman controlled both sides of the transactions. Petitioners and respondent agree that Cualquier and Picaro, the sellers in name, were merely facades of Schulman.

We have often considered arm's-length sales of the same property shortly before the valuation date to be persuasive evidence of its fair market value. *Tripp v. Commissioner,* 337 F.2d 432, 434-435 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; *Narver v. Commissioner,* 75 T.C. at 97-98. November, employed by Schulman, negotiated the purchase of the Jeffersonville Post Office at arm's length for $315,000 and immediately sold the same to Clark, Ltd. for $545,000. November negotiated the purchase of the Sedalia Post Office at arm's length for $587,000 approximately 5 months before selling the same to Trout, Ltd. for $1,185,000. Given the proximity in time between the consecutive sales of each post office, the first sales price is persuasive evidence of the fair market value when purchased by the partnership.

Both parties provided expert testimony on the fair market value of the post offices on the dates of the

partnerships' purchases. There are three basic methods used to value real property and other assets. The market-data approach involves comparisons of the subject property to similar properties sold in the same time frame and geographic area. The replacement-cost approach values the property based on the cost of replacing the land and building currently less an allowance for diminished utility. The income-forecast approach involves discounting to present value the expected income from the property.

Petitioners' expert was Russell A. Patterson (Patterson), who at the time of trial was employed by the Valuation Services Group of the Los Angeles office of Deloitte, Haskins & Sells. Patterson relied on the replacement-cost method in appraising the values of the Sedalia and Jeffersonville post offices at $545,000 and $1,185,000, respectively, equaling the partnerships' purchase prices. Patterson's appraisals contained at least three major defects. First, Patterson's report was void of any data, analysis, or explanations on how he reached his conclusions. His three-page report plus exhibits contained little more than a brief discussion of the replacement cost approach methodology, a list of his credentials, and his valuation conclusions. Such conclusions alone bear little, if any, probative value. Patterson never disclosed, for instance, in his report or at trial his estimate of replacement cost new or the diminished utility of the components of each post office, principal factors in the replacement cost approach. Assuming that he did analyze the diminished utility of all of the components of the properties, we would still have doubts about the reliability of such analysis, given that he never visited the sites.

Second, Patterson could provide no reasonable explanation at trial for favoring the replacement cost method in this case over other methods. Patterson was aware when he filed his report of the prices at which November, in the names of Cualquier and Piedra, purchased the post offices in arm's-length transactions and knew of the controlled nature of the subsequent sales to the partnerships. He testified in spite of established valuation principles, however, that a sale of the same property, even if occurring within days of the valuation date, is not probative of

market value. Patterson's approach was predicated on ownership of fee simple interests in the properties and ignored the effect of the Postal Service's leases on the value of the properties. He admitted at trial, however, that a buyer could not have purchased a fee simple interest in the post offices on the dates of valuation.

Third, the reasonableness of the purchase price, according to his testimony, assumed that the tax benefits of depreciation claimed on that purchase price would be received by the purchaser. Thus his appraisal was based on assumed net after-tax returns. In summary, he ignored market value and computed "tax benefit value." We conclude that Patterson's appraisal was unreliable.

Respondent's expert, Michael A. Roda (Roda) of AIBE Valuation, relied on the income forecast method in appraising the values of the Jeffersonville and Sedalia Post Offices at $310,000 and $700,000, respectively. Roda's report did not take into account the prices at which the Panamanian entities purchased the post offices because, according to his testimony, he was unaware of such transactions when his report was filed. Roda's appraisals were predicated on the Postal Service's exercise of the purchase options at the prices set forth in the leases, which he considered to be ceilings on the values of the properties. Roda, assuming that the first of the six purchase options under each lease was as likely to be exercised as the last, essentially averaged the first and last option prices and discounted the average to account for sales of leased fees in reaching his conclusion. Imprecision obviously results from his arbitrary assumption as to the likelihood of the exercise of the purchase options under the leases. Nevertheless, his appraisals were not unreasonable and at a minimum suggested that the partnerships purchased the post offices at highly inflated prices.

Petitioners challenge Roda's conclusions on brief, and apparently attempt to bolster Patterson's appraisal, by asserting that the fair market value of each post office should reflect the favorable seller financing. We have rejected this theory of valuation in at least one other case. *Finkelman v. Commissioner,* T.C. Memo. 1989-72. In any event, because this theory of valuation was not addressed

by Patterson in his expert report, petitioners' argument lacks evidentiary support.

We conclude that the fair market values of the Jefferson and Sedalia post offices when acquired by the partnerships did not exceed $315,000 and $587,000, respectively. In a relative sense, the purchase prices and face amounts of the long-term nonrecourse notes exceeded the fair market value of the Jeffersonville and the Sedalia post offices by 73 percent and 102 percent, respectively. In absolute terms these disparities represented several hundred thousand dollars. Applying the test fashioned in *Estate of Franklin* to this case, it is abundantly clear that the partnerships' transactions lacked from the outset the substance necessary to treat them as sales.

The partnerships had no equity in the post offices during any of the years before the Court. Even after 25 years of principal payments, each partnership's outstanding debt would still be substantially more than the fair market value of the post office at the time of acquisition. The presence of purchase options in each of the post office leases further assured that the partnerships would have no equity in the post offices at least until some remote point in time. As long as the post offices remained under lease to the Postal Service, the purchase option prices set forth in the leases would effectively represent maximum limits on the sale price of the properties. The partnerships' outstanding debt would exceed these purchase option prices for at least 20 years beyond the inception of the notes.

The partnerships thus acquired interests in the post offices that could be prudently abandoned. The gross disparity between the purchase price and fair market value of each post office and the absence of arm's-length dealing compels a holding that the partnerships did not have investments that could be depreciated. Further, there was no economic significance to the partnerships' long-term nonrecourse notes, given that the partnerships never confronted a situation in which it was economically reasonable to make a capital investment in the amount of the unpaid purchase price. *Estate of Franklin v. Commissioner,* 544 F.2d at 1048-1049.

Petitioners suggest, although without evidentiary support, that economic substance of the transactions and notes is derived from the potential appreciation of the post offices. The paradox of this position is that if the value of each post office was as high as petitioners have contended, or appreciated significantly higher than the prices at which the options could be exercised, it would be unrealistic to assume that the Postal Service would not exercise the purchase options. If not, there is nothing in the leases prohibiting the Postal Service from assigning the purchase options. Given the long-term disparity between the outstanding balance of the notes and the purchase option prices, the appreciation of the properties might assure that petitioners would experience an economic loss.

Petitioners urge us not to consider the presence of the purchase options in determining whether the notes were likely to be paid because the Postal Service probably would not exercise them. In support of their contention, petitioners rely on Patterson's testimony that the Postal Service generally exercises less than 2 percent of the purchase options contained in post office leases. This simple statistical argument—based on hearsay and no reliable evidence—is not persuasive. Patterson's testimony was based on telephone calls to the real estate department of the Postal Service, and his inquiry did not differentiate between options at fair market value and options below fair market value.

Petitioners also maintain that the validity of the long-term notes for tax purposes is supported by certain objective facts. Specifically, petitioners allege (1) that the obligations were documented by debentures payable to Cualquier and Picaro and were secured by the properties, (2) that the long-term notes were assigned to institutional lenders as security for borrowings by Schulman and the trusts, thus necessitating payment of each note in order to free the realty for disposition or sale by the partnerships, (3) that the debt service on each long-term note was covered by the lease rentals, and (4) that even with his present knowledge of the price mark-up of the post offices, petitioner refused to consent to a sale of the Clark, Ltd.

property to Schulman proposed during the course of the Adams suit.

Generally, these allegations have no relevance to our analysis, which hinges on the value of each post office on the date of acquisition, and need not be addressed. A discussion of petitioners' allegation regarding the partnerships' cash-flow, however, is warranted, as the relevant evidence bolsters our conclusion. The allegation that the rent under the post office leases would have covered the partnerships' debt service is patently untrue with respect to Clark, Ltd., whose annual debt service of $25,440 under its 42-year note would have substantially exceeded the annual rent due under the Jeffersonville post office lease if exercised beyond the first renewal term—$17,500. Petitioners' allegation is misleading in any event because the partnerships' cash outflow included the recurring obligations of maintaining and/or repairing the post office premises pursuant to the leases in addition to paying debt service. Except for the relatively short-term management agreements executed between the partnerships and PMSC, which generally equaled the difference between the rentals and the debt service, petitioners provided no evidence that maintenance or repair costs would probably not have escalated and exceeded this difference during the term of the long-term notes. Against this backdrop—the gross disparity between the outstanding principal balances of the long-term notes and the fair market value of the post offices, the absence of any potential equity for decades, the absence of personal liability on the notes, the presence of purchase options at prices below the amounts of indebtedness, and the absence of proof that the partnerships would probably have a positive or equal cash-flow during the terms of the notes—it is highly unlikely that the long-term notes would ever be paid off.

Petitioners contend that *Commissioner v. Tufts*, 461 U.S. 300 (1983), requires that, regardless of market value of the post offices, the principal amount of the nonrecourse notes must be included in the basis of the properties for depreciation purposes. We and other courts have rejected this argument in numerous cases. *Saviano v. Commissioner*, 765 F.2d 643, 649 (7th Cir. 1985), affg. 80 T.C. 955 (1983);

*Odend'hal v. Commissioner,* 748 F.2d 908, 913 (4th Cir. 1984), affg. 80 T.C. 588 (1983); *Brannen v. Commissioner,* 722 F.2d 695, 702 n. 4 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Herrick v. Commissioner,* 85 T.C. 237, 261 (1985); *Dean v. Commissioner,* 83 T.C. 56, 78 n. 10 (1984). In *Tufts,* the Supreme Court extended the concept of *Crane v. Commissioner,* 331 U.S. 1 (1947)—that the principal amount of a nonrecourse obligation must be included in the basis of property for purposes of computing the amount realized at sale—to a case where the unpaid amount of the nonrecourse obligation exceeds the market value of the property at the time of sale. The Court's opinion in *Tufts,* as in *Crane,* was predicated, however, on the assumptions that the mortgagor incurred an obligation to repay and that the mortgage would be paid in full. 461 U.S. at 309, 312. Neither assumption is appropriate in this case.

As an alternative, respondent argues, and we conclude, that the partnerships' activities were not engaged in for profit. Deductions claimed for depreciation under section 167 and for management fees and operating expenses under section 162 (or section 212) are allowed only if the expenses are incurred in connection with the taxpayer's trade or business (or in connection with the production of income). The threshold element in determining whether this requirement has been met is a showing that the activity in question was entered into with an "actual and honest objective of making a profit." *Dreicer v. Commissioner,* 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profit is not required, the activity must be entered into, in good faith, with the objective of making a profit, i.e., taxable income, therefrom. Sec. 1.183-2(a), Income Tax Regs.; *Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Taube v. Commissioner,* 88 T.C. 464, 478-479 (1987).

The objective of making a profit must exist at the partnership level. *Polakof v. Commissioner,* 820 F.2d 321 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; *Flowers v. Commissioner,* 80 T.C. 914, 932 (1983); *Brannen v. Commissioner,* 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Our focus is on the intent of Schulman, as

promoter and general partner of Clark, Ltd. and Trout, Ltd., because he actually controlled the partnerships' activities.

In *Independent Electric Supply, Inc. v. Commissioner,* 781 F.2d 724 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, the taxpayers invested in limited partnerships and/or trusts for the ostensible purpose of acquiring and exploiting patents. The patents were acquired for the partnerships and trust by the promoters for relatively small amounts of cash and large recourse obligations. None of the patents earned any net income, while losses were substantial. The taxpayers, in their capacities as limited partners or beneficiaries, claimed depreciation, research and development expenses, and various business expenses, all of which were disallowed by the Commissioner. We agreed with the Commissioner in disallowing the taxpayers' losses because the patent activities in issue were not entered into with the requisite profit objective. *Lahr v. Commissioner,* T.C. Memo. 1984-472. In reaching this conclusion, we observed that (1) the purchase prices of the patents were "grossly inflated" through the use of nonrecourse indebtedness without any real negotiation or serious investigation of patent marketability; (2) the partnerships and trusts were marketed by emphasizing the projected tax benefits of investment in them rather than the economic viability of the patents; (3) the entities had histories of substantial losses; (4) there was practically no possibility that potential appreciation in the value of the patents would make the patent activities profitable, given the grossly inflated purchase price; and (5) the entities were not operated in a businesslike manner.

In affirming our decision, the Court of Appeals for the Ninth Circuit described the inflated purchase price of the patents as "Perhaps the most important single factor suggesting that the actual motive for the patent activities was tax avoidance rather than even speculative profit. " 781 F.2d at 728. See also *Flowers v. Commissioner,* 80 T.C. at 937.

There are numerous indications that the partnerships' objectives were to generate tax deductions rather than to realize economic profits, some of which indications have

been discussed at length. Notable examples include (1) the unreasonable inflation of the purchase prices, *Independent Electric Supply, Inc. v. Commissioner,* 781 F.2d at 728; (2) the emphasis in the promotional material of tax benefits, particularly the ostensible first-year interest deductions equal to the limited partners' entire cash contribution, and the absence of any economic profit projections or appraisals of the post offices conducted around the time of the partnerships' purchases, *Independent Electric Supply, Inc. v. Commissioner, supra;* and (3) the existence of large nonrecourse notes which are unlikely to be paid, *Thomas v. Commissioner,* 84 T.C. 1244, 1280 (1985), affd. 792 F.2d 1256 (4th Cir. 1986), and the cases cited therein.

Petitioners argue that transactions involving ownership of real estate, as engaged in by Clark, Ltd. and Trout, Ltd., were granted favorable tax treatment by Congress; therefore, they are not required to show that the partnerships engaged in the transactions with an actual and honest objective for economic profit in order to deduct their distributive shares of the losses. In this regard, petitioners rely on *Fox v. Commissioner,* 82 T.C. 1001, 1021 (1984), and *Estate of Baron v. Commissioner,* 83 T.C. 542, 552 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

Neither of these cited cases supports petitioners' arguments. Neither involved real estate transactions, and in neither case did we conclude that the taxpayer entered into the activity in issue for profit. In *Fox,* involving losses incurred in transactions entered into for profit under section 165(c)(2), we acknowledged that many "tax-motivated transactions are congressionally approved and encouraged. We therefore relax our holding that section 165(c)(2) permits loss deductions only from transactions entered into primarily for profit to allow for those essentially tax-motivated transactions which are unmistakably within the contemplation of congressional intent. " 82 T.C. at 1021. We held that the investor-taxpayer's tax-straddling options transactions, however, were not among the variety of tax-motivated transactions that Congress intended to encourage. Similarly, there is no legal authority sanctioning the tax-related fictitious valuations and circular money schemes involved

here. See *Beck v. Commissioner,* 85 T.C. 557, 579-580 (1985).

In *Estate of Baron,* we distinguished the taxpayer's purchase of master recordings using nonrecourse indebtedness from situations involving acquisitions of rental real estate with nonrecourse indebtedness, noting in the latter situation that payments on a nonrecourse note are usually fixed in amount, that the underlying property has potential value apart from its projected income stream, and that the value is not so dependent upon public acceptance. 83 T.C. at 552. While we agree with petitioners that real estate investments are often not as speculative as investments in master recordings, this characteristic is no ground for relaxing the profit objective requirement under section 183 with respect to the transactions of Clark, Ltd. and Trout, Ltd.

Finally, petitioners' arguments ignore their own admissions. The complaints filed by Schulman partnership investors in the civil suits against Schulman and other defendants, in which petitioners were either named plaintiffs or class members, allege numerous facts that suggest that the partnerships' activities were not entered into for profit, including among others that the partnerships purchased the properties at highly inflated prices, that the partnerships were marketed as tax shelters, and that there was no possibility of economic gain on the investments. When petitioner was asked at trial whether he believed certain allegations, specifically Paragraph 28(A)-(C) of the Adams complaint ((A) that there was no reasonable possibility of economic gain for the investors, (B) that the transactions were shams and devoid of economic substance, and (C) that the purchase prices substantially exceeded market value), to be true, petitioner responded:

Based upon what I know now, the allegation in Paragraph C certainly seems to be true; the allegation in Paragraph B, according—as I understand it, to the findings in the trial of Mr. Schulman, are true. I guess, therefore, that there is no reasonable possibility of economic gain based upon those things now, but I, of course, did not know those prior to this time.

Petitioners are thus not entitled to any trade or business losses in connection with the activities of the Schulman partnerships.

## *Additions to Tax and Additional Interest*

We must determine whether petitioners are liable for additions to tax under sections 6653(a) and 6661 and additional interest under section 6621(c). Respondent first raised the sections 6653(a) and 6621(c) issues by amendment to answer and thus bears the burden of proof on those issues. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners dispute each assertion and raise, for the first time on brief, a claim for abatement of interest under section 6404(e).

### *Section 6653(a)*

Section 6653(a) provides that an addition to tax shall be imposed if *any* part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner,* 85 T.C. 934, 937 (1985).

Respondent argues that petitioners did not exercise reasonable care in determining the validity of their deductions before claiming them. Petitioners argue that they were innocent victims of a fraudulent promoter and cannot, by reason of Schulman's misfeasance, be found negligent. The deductions, petitioners contend, were legitimate as far as they could determine.

In light of all of the evidence, petitioners' claim to the tax benefits promised by the partnerships must be considered negligent. Petitioners relied exclusively on the offering memoranda and the advice of a salesman of the partnership interests, the treasurer and office accountant of petitioner's advertising firm, and his business partner in deciding to contribute sizeable sums to the partnerships. Petitioners did not seek an appraisal of the property before making their investments and claiming the deductions. In each of the years in issue, petitioners' underpayment was attributable in varying amounts to partnership deductions for deprecia-

tion, interest expenses on the short-term and/or long-term notes, and management fees. Diligence and prudence certainly would have averted *some,* if not all, of the underpayment.

Even a cursory examination of the partnerships' instruments would have raised grave doubts in the mind of a reasonable, prudent investor as to the promised tax benefits. We must assume that petitioners purposefully looked away from the realities of the partnerships' activities. They are liable for the addition to tax under section 6653(a).

*Section 6661*

With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any substantial understatement of income tax. The amount of the understatement is computed in accordance with section 6661(b)(2)(B) and (C). The amount of understatement is reduced if there is substantial authority for the tax treatment of the item at issue (section 6661(b)(2)(B)(i)) or if the relevant facts affecting the item's tax treatment are adequately disclosed (section 6661(b)(2)(B)(ii)). In the case of "tax shelters," however, i.e., a partnership whose principal purpose is the avoidance or evasion of Federal income tax, the reduction for adequate factual disclosure does not apply, and the reduction for substantial authority applies only where the taxpayer reasonably believed that the tax treatment was more likely than not proper.

The only reasonable conclusion on the record is that the principal purpose of the partnerships was income tax avoidance.

Petitioners argue that, if the partnerships were "tax shelters," they are nonetheless entitled to a reduction of their understatement on the grounds that they reasonably believed that their tax treatment of the partnerships' transactions was more likely than not proper and that they had substantial authority for their position. We disagree. As discussed above, petitioners' belief as to the tax treatment of the partnerships' activities was founded on an unreasonable disregard of the relevant facts and law. In any event, petitioners' authority is generally distinguishable from the facts of this case. *Antonides v. Commissioner,* 91

T.C. 686, 702-703 (1988). The principal authorities cited by petitioners in this case—section 165(e) and the regulations thereunder, *Nichols v. Commissioner,* 43 T.C. 842 (1965), and *Commissioner v. Tufts,* 461 U.S. 300 (1983)—either were distorted by petitioners or have been distinguished in analogous cases.

*Section 6621(c)*

Section 6621(c) provides for an increase in the rate of interest accruing on tax deficiencies where there is a substantial underpayment in any taxable year attributable to "tax-motivated transactions." Section 6621(c)(3)(A)(v) provides that any "sham or fraudulent transaction" is a tax-motivated transaction. Under section 301.6621-2T, A-4, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50392 (Dec. 28, 1984) any deduction disallowed under sections 183 or 165(c)(2), relating to activities or transactions not engaged in for profit, is considered to be attributable to a tax-motivated transaction. In view of these provisions, all of the losses in issue are attributable to tax-motivated transactions. *Patin v. Commissioner,* 88 T.C. 1086 (1987), affd. sub nom. without published opinion *Hatheway v. Commissioner,* 856 F.2d 186 (4th Cir. 1988), affd. sub nom. without published opinion *Skeen v. Commissioner,* 864 F.2d 93 (9th Cir. 1989), affd. sub nom. without published opinion *Patin v. Commissioner,* 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *Gomberg v. Commissioner,* 868 F.2d 865 (6th Cir. 1989). It is undisputed that the partnerships' short-term notes were shams. In disallowing petitioners' losses, we have concluded that the partnerships' purchases of post offices and financing lacked economic substance and that the transactions were not engaged in for profit. Therefore, petitioners are liable for the additional interest.

*Section 6404(e)*

We lack jurisdiction to address petitioners' claim for abatement of interest under section 6404(e). *508 Clinton Street Corp. v. Commissioner,* 89 T.C. 352 (1987).

To take account of additions to tax asserted by respondent in his amendment to answer,

*Decision will be entered under Rule 155.*