RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FEDERAL DEPOSIT INSURANCE CORPORATION,
            *Plaintiff-Appellee,*

            *v.*

JEFF MILLER STABLES, *et al.,*
                        *Defendants-Appellants.*

No. 07-4436

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 04-07586—Christopher A. Boyko, District Judge.

Submitted: August 1, 2008

Decided and Filed: July 23, 2009

Before: KENNEDY, GILMAN, and GIBBONS, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Catherine H. Killam, McHUGH & McCARTHY, Sylvania, Ohio, for
Appellants. Jaclyn C. Taner, FEDERAL DEPOSIT INSURANCE CORPORATION,
Arlington, Virginia, for Appellee.

    GIBBONS, J., delivered the opinion of the court, in which GILMAN, J., joined.
GILMAN, J. (pp. 17-21), delivered a separate concurring opinion. KENNEDY, J. (pp. 22-
30), delivered a separate dissenting opinion.

_____

**OPINION**

_____

    JULIA SMITH GIBBONS, Circuit Judge. Jeff and Lori Miller, husband and wife
("Jeff" and "Lori" or "the Millers"), along with their horse-racing operation Jeff Miller
Stables and its predecessor in interest Miller Brothers Stables, appeal from the order of the
district court requiring them to pay more than $2 million in restitution to the Federal Deposit
Insurance Corporation ("FDIC") in its role as receiver for the failed Oakwood Deposit Bank

1

Company. The Millers argue that the district court erred in granting summary judgment for the FDIC because they raised multiple issues of material fact concerning the amount of recovery Ohio law entitled the FDIC to receive. We disagree and hold that Jeff's conclusory statements, without more, are not enough to raise a genuine issue of material fact. Consequently, we affirm the judgment of the district court in its entirety.

**I.**

The facts giving rise to the instant litigation began to materialize on February 1, 2002, when the Oakwood Deposit Bank Company ("ODBC") of Oakwood, Ohio, failed. The FDIC took over ODBC as its receiver and commenced an investigation to determine the cause of the bank's failure. Investigators quickly surmised that ODBC had failed because its chief executive officer, Mark Steven Miller ("Steve"), had engaged in a massive embezzlement scheme causing losses of more than $48 million. Steve pled guilty to charges of money laundering and embezzlement and is currently serving a 168-month sentence in federal prison. With the criminal investigation at an end, the FDIC, in its role as ODBC's receiver, began to attempt to recover for the bank some of the funds Steve had embezzled from the 1980s until the bank's 2002 failure. The search for recoverable assets led the FDIC to probe the business relationship between Steve and his brother Jeff.

Jeff and Steve were general partners in a horse-racing operation known as Miller Brothers Stables ("MBS"). MBS trained and raced standardbred horses – those that race while pulling a sulky, as in harness racing. The brothers' racing operation began in 1989 when Jeff purchased a 52.85 acre farm (the "Farm") in Paulding County, Ohio, from which the brothers bred and trained their horses. At its zenith, MBS consisted of more than forty standardbred racing horses, a number of foals and yearlings, and a 47.5% stake in Eternal Camnation Stables.[1] In his guilty plea and in an affidavit before the district court in this civil proceeding, Steve admitted that he embezzled the $65,000 Jeff used to purchase the Farm from ODBC. Jeff denied that he had any knowledge of the funds' illicit origin and instead asserted that he believed that the money was a legitimate loan from ODBC. He

---

[1]Eternal Camnation Stables houses the horse that retired in 2004 as the richest mare in the history of harness racing, having collected $3,748,574 in purses over her storied career. *See Eternal Camnation Expecting*, http://www.harnesslink.com/www/Article.cgi?ID=30397 (last visited Apr. 30, 2009).

further claimed to have made regular payments on the $65,000 loan; however, according to Jeff, he made these payments directly to Steve rather than to ODBC.

In 2001, Jeff and Lori joined with Steve, Steve's wife Janet Miller ("Janet"), and another relative Seth Miller ("Seth") to purchase 55.8 acres of land adjacent to the Farm (the "adjacent property"). Jeff and Lori owned a 48% share of the adjacent property. Steve admitted to embezzling from ODBC the $128,340 purchase price for the property. The addition to the Farm, which more than doubled its original size, enabled the Millers to expand their horse-training and breeding operation. It also allowed their son to build a house on a portion of the adjacent property. Jeff and Lori assert that they did not know that Steve had embezzled the funds; they do, however, admit that they made no payments to ODBC or anyone else to repay the money used to purchase the adjacent property. Following the failure of ODBC and Steve's indictment, Jeff transferred all of MBS's assets to a new sole proprietorship, Jeff Miller Stables ("JMS"), in which Steve had no interest. Jeff made the transfer because the rules of the United States Trotting Association ("USTA") prevent any horse whose owner is under indictment from racing in a sanctioned event. The transfer of the assets from MBS to JMS occurred without the payment of any consideration.

To aid its investigation, the FDIC hired a team of forensic accountants to examine ODBC's books and to determine if any of the transactions were fraudulent. The accountants traced the money Steve advanced from ODBC to various ledger accounts of MBS. If the accountants saw that the offsetting entries contained even a very general description such as "time deposit" or "note," they did not label the underlying transfer of funds as fraudulent. Nor did the accountants label as fraudulent transactions between deposit accounts held by different entities Steve controlled. The accountants instead identified several specific ledger accounts as the source of fraudulent funds and traced those funds from the bank to the Miller-related entities. The forensic accountants labeled only these funds as fraudulent. The accountants' May 2004 report concluded that MBS received $1,722,223 in fraudulent transfers from ODBC. MBS also benefitted from $182,117 of fraudulent cashier's checks drawn on ODBC and paid to third parties

on MBS's behalf, making the total amount of embezzled funds used by Steve to maintain MBS as a going concern $1,904,340. This sum was in addition to the funds Steve embezzled to purchase the Farm and the adjacent property.

Armed with this information, the FDIC filed suit against Jeff, Lori, MBS, and JMS on September 28, 2004, seeking disgorgement of the sums of money by which Jeff, Lori, and Jeff's horse-racing operations had been unjustly enriched.[2] Importantly, the FDIC did not allege that Jeff and Lori had actual knowledge of Steve's embezzlement scheme. On March 23, 2007, the district court entered summary judgment in favor of the FDIC as to the $65,000 used to purchase the Farm and the $61,870 used to purchase the adjacent property.[3] The district court, however, denied summary judgment as to the FDIC's claim for the more than $1.9 million that Jeff's racing operation allegedly benefitted from the funds Steve embezzled from ODBC. The district court held that the FDIC had failed to prove that Steve had not committed fraud on the partnership. Fraud on the partnership would prevent the imputation of knowledge of Steve's embezzlement to Jeff and thereby prevent the FDIC's recovery. *See* Ohio Rev. Code Ann. § 1775.11. Following this partial denial of its summary judgment motion, the FDIC unsuccessfully sought reconsideration of the district court's order and permission to file an interlocutory appeal.

On August 31, 2007, the district court entered an order requiring the parties to brief the issue of who held the burden of proving fraud on the partnership under Ohio law. After hearing arguments from counsel, the district court concluded that Jeff, as the party asserting the exception, bore the burden of proving that Steve had defrauded the partnership. The district court determined that in light of the evidence presented by both parties, Jeff had not carried his burden to prove fraud. The district court also held that the nearly two-hundred pages of purse receipts reflecting the earnings of MBS's winning

---

[2] Claims one and two, involving the funds used to purchase the Farm and the adjacent property, are against Jeff and Lori. Claim three, involving the funds embezzled to maintain MBS as a going concern, is against MBS, Jeff as a general partner of MBS, and JMS jointly and severally.

[3] The $61,870 figure represents the value of Jeff and Lori's proportional ownership share in the adjacent property.

horses over the period from 1998-2001 did not undermine the forensic accountants' conclusions. Consequently, the district court entered summary judgment on the FDIC's final claim in the amount of $1,904,340. The Millers timely filed their appeal.

## II.

The Millers argue that the district court erred in granting summary judgment on each of the three claims made by the FDIC for restitution. Jeff and Lori contend that genuine issues of material fact exist thereby making summary judgment inappropriate. We review a district court's grant of a summary judgment motion *de novo*. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007). Summary judgment is appropriate where there are no *genuine* issues of *material* fact in dispute, and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (emphasis added). The moving party may meet is burden by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A trial is required only when "there are any genuine factual issues that properly can only be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to require a trial, *id.* at 252; but we must be careful to draw "all justifiable inferences" in the nonmovant's favor. *Id.* at 255. Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action'" rather than a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## A.

The Millers' first assignment of error surrounds the district court's granting summary judgment in favor of the FDIC as to the $65,000 used to purchase the Farm in

1989.  They make two arguments on appeal.  Jeff and Lori first claim that Federal Rule of Evidence 609 required the district court to draw the conclusion that Steve, a convicted felon, lied in his affidavit when Steve asserted that he embezzled the $65,000.  Additionally, they argue that a jury could reasonably find that they made payments on what they perceived to be a $65,000 loan from ODBC.  The FDIC responds by arguing that Rule 609 merely allows the impeachment of a party who stands convicted of a crime involving dishonesty rather than requires the district court to draw any negative inference.  Consequently, the FDIC asserts that the district court properly granted summary judgment as to the funds employed to purchase the Farm.

Under Ohio law, in order for the FDIC to recover under a theory of unjust enrichment, it must prove that ODBC conferred a benefit upon Jeff, Lori, and Jeff's horse-racing operations; that they had knowledge of this benefit; and that it would be unjust for them to retain this benefit without payment.  *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984); *see also Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005).  Unjust enrichment arises out of a contract implied in law. *Hummel v. Hummel*, 14 N.E.2d 923, 925-26 (Ohio 1938).  "Contracts implied in law are not true contracts," *id.* at 926, but instead are quasi-contracts implied by courts when a party "retains money or benefits which in justice and equity belong to another."  *Id.* at 927.  Ohio law contains no requirement that a party have acted improperly for an action based upon quasi-contract to succeed.  *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002) (applying Ohio law).  Passive retention of a benefit where such retention is "unconscionable" is enough to trigger liability.  *Cosby v. Cosby*, 750 N.E.2d 1207, 1213 (Ohio Ct. App. 2001), *rev'd on other grounds*, 773 N.E.2d 516 (Ohio 2002); *see also Estate of Woodruff v. Istanich*, 2008-Ohio-2103, at ¶ 14 (Ct. App.) (noting that whether retention of the benefit would be unconscionable is one element to consider before granting a remedy in an unjust enrichment claim).

**1.**

Steve submitted an affidavit to the district court in which he admitted to embezzling the $65,000 in 1989. The report of the forensic accountants does not contain a finding with regard to the $65,000 used to purchase the Farm because the accountants did not go back that far in time in their efforts to reconstruct ODBC's books. The Millers argue that the district court erred by refusing to draw the conclusion that Steve, a convicted felon, lied in his affidavit. Federal Rule of Evidence 609 provides in pertinent part:

> For *the purpose of attacking the character* for truthfulness of a witness . . . evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

Fed. R. Evid. 609(a)(2) (emphasis added). Embezzlement is a crime of dishonesty that is always admissible to attack the character of a witness. *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990). However, Rule 609 contains no language requiring the court to necessarily draw the inference that the witness's testimony is untrue. *See Guerrero v. White*, No. 98-6342, 1999 U.S. App. LEXIS 34488, at *8 (6th Cir. Dec. 28, 1999 ) (noting that even after evidence of a past conviction is admitted under Rule 609, the witness's "credibility remained a question for the trier of fact based on both his testimony and the inferences to be drawn from the record as a whole"). It is also inappropriate for a court to make credibility determinations when considering a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (noting that credibility determinations "are jury functions, not those of a judge" (quoting *Anderson*, 477 U.S. at 255)). We therefore hold that it was not error for the district court to decline to draw an inference as to Steve's credibility.

**2.**

Jeff and Lori's second argument is that a rational trier of fact could find that they had made payments to Jeff's brother on what they perceived to be a loan.  In his affidavit in response to the FDIC's motion for summary judgment, Jeff stated that he and Lori "made payments by turning the checks over to Steve that we in turn received from a tenant who was purchasing a 20-acre parcel from us under land contract and from other sources." (Aff. of Jeff Miller at 2.)  Despite this assertion, the Millers failed to present the district court with a copy of even a single check that they turned over to Steve as partial payment on their obligation to ODBC.  Nor did they present a bank statement showing a series of transfers at standard intervals from their account to Steve for similar amounts.  The Millers failed even to present or name one witness who could testify that they made a single payment to Steve on the purported loan.  As the Supreme Court has held, "[w]hen the moving party has carried its burden under Rule 56(c)," including via a properly sworn affidavit, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Through their complete failure to provide any corroboration for their bare assertion that they made payments on the loan to Steve, the Millers have fallen far short of raising a genuine issue for trial. Jeff and Lori received $65,000 from ODBC and knew that they used the funds to purchase and enjoy the benefit of their 52.85 acre farm.  Because Steve embezzled the money and the Millers have made no payments to ODBC, it would be inequitable for the Millers to keep the benefit of the Farm without repaying the funds used to purchase it to ODBC.  *Cosby*, 750 N.E.2d at 1213 (passive retention of a benefit where such retention is inequitable triggers liability). We therefore find that the district court did not err in granting summary judgment to the FDIC in regard to the $65,000 used to purchase the Farm in 1989.

**B.**

Jeff and Lori next assert that the district court erred by granting summary judgment on the FDIC's claim for reimbursement of the $61,870 expended to purchase the 55.8-acre adjacent property.  The Millers argue that it is inequitable to require them to pay for "land they will never enjoy" because the government has obtained a forfeiture order as to Steve and Janet Miller's undivided one-half interest in the land.  (App. Br. at 18.)  Jeff and Lori further argue that even if restitution is proper, the district court erred in calculating the amount due by basing the award upon the amount lost by ODBC rather than the value gained by Jeff and Lori.  The Millers concede that they have failed to make any payments to ODBC on the "loan" used to purchase the adjacent property and further admit "that it would be unjust for them to keep the property without payment." (App. Br. at 17.)  The FDIC wholeheartedly agrees with this assessment and urges us to reject the Millers' remaining arguments.

Jeff and Lori's first argument – that they have not benefitted from ownership of the adjacent property – is without merit.  The Millers used the property, located next to the Farm, to aid in the expansion of Jeff's horse-racing operation and even allowed their son to build a home on part of the property.  Under any definition of the term "benefit," the Millers realized significant advantages upon acquiring their share of the adjacent property.  It is also undisputed that Jeff and Lori have retained the money that ultimately came from ODBC and purchased the property without repayment.  The FDIC seeks repayment of the *money* the Millers have improperly retained.  *See Hummel*, 14 N.E.2d at 927 ("[U]njust enrichment of a person occurs when he has and retains *money or benefits* which in justice and equity belong to another.") (emphasis added).  Because we find that Jeff and Lori have received significant benefits from their use of ODBC's money, we hold that the district court did not err in its finding that the Millers knowingly received a benefit.

Jeff and Lori's second argument that the district court erred in its calculation of the restitution owed is also incorrect.  The total purchase price for the property was $128,340.  Dividing this purchase price by 55.8 acres, yields a per-acre price of exactly

$2,300. The district court then deducted the two acres of the adjacent property owned by Seth. This left 53.8 acres, which the district court divided evenly between Jeff, Lori, Steve, and Janet. Simple math yields the result that Jeff and Lori unjustly retained the benefit of $61,870, as the district court found. The Millers are correct that we have held that "the proper measure of liability is the reasonable value of services" provided. *Reisenfeld*, 277 F.3d at 862. Ohio case law, however, further clarifies that "[t]he reasonable value of the benefit conferred is *the monetary amount expended* for the services provided." *City of Girard v. Leatherworks P'ship*, 2005-Ohio-4779, at ¶ 41 (Ct. App.) (emphasis added) (citing *St. Vincent Med. Ctr. v. Sader*, 654 N.E.2d 144, 147 (Ohio Ct. App. 1995)). The "service" provided by ODBC was the embezzled funds used for the purchase of the adjacent property. The Millers do not contest the purchase price of the property or the propriety of the district court's determination of their ownership share therein. Further, the report of the forensic accountants specifically labeled the entire sum used to purchase the 55.8 acre parcel as embezzled from OBDC. We therefore hold that the district court did not err under Ohio law in its calculation of the appropriate amount of damages owed to the FDIC.[4]

## C.

The final assignments of error involve the district court's entry of summary judgment as to the $1,904,340 the FDIC alleged MBS, and by extension JMS, benefitted from Steve's embezzlement scheme. Jeff[5] raises two primary arguments on appeal. First, Jeff argues that the district court erred by requiring him to prove that there was fraud on the partnership to invoke the exemption provided by Ohio Revised Code Section 1775.11, rather than requiring the FDIC to prove that Steve did not defraud the partnership. Alternatively, Jeff asserts that even if the district court did properly hold

---

[4]On the issue of the proper measure of damages, we note that one might expect the FDIC to seek a reasonable rate of interest on the $61,870 Jeff and Lori have had use of since 2001. The FDIC did not appeal the final order of the district court; therefore, we have no occasion to consider whether the FDIC could recover for the time value of ODBC's money. Additionally, we take note of the FDIC's stipulation that it will not seek a double recovery so that should Steve repay the entire $128,340 purchase price, the FDIC will not seek to collect the $61,870 judgment from the Millers.

[5]For the purposes of Section II.C of this opinion, "Jeff" refers to MBS, Jeff as a general partner of MBS, and JMS jointly and severally.

that Jeff and the horse-racing operations are liable to the FDIC, the district court erred by declining to hold a trial on the proper amount of damages. We will consider each issue in turn.

**1.**

Jeff argues that the district court erred in construing the provisions of Section 1775.11 of the Ohio Revised Code, which allows a court to impute knowledge of an action taken by one partner to all partners in a partnership "except in the case of fraud on the partnership committed by or with the consent of that partner." Ohio Rev. Code Ann. § 1775.11. In its order granting summary judgment, the district court held that Jeff had the burden to prove that the exception applied. Because Jeff provided no concrete evidence, other than his own assertions of fraud, that Steve had defrauded the partnership, the district court granted summary judgment in favor of the FDIC. We review the district court's statutory construction of Ohio law under the same *de novo* standard that applies to summary judgment generally. *See BLE Int'l Reform Comm. v. Sytsma*, 802 F.2d 180, 183 n.4 (6th Cir. 1986).

Jeff is correct that there is a dearth of Ohio case law interpreting Section 1775.11. We, along with the district court, have been unable to find any case law on point as to what party has the burden of persuasion on the issue of asserting the fraud-on-the-partnership exception. As with any other instance in which we must interpret a state law, "When there is no state [case]law construing a state statute, [we] must predict how the state's highest court would interpret the statute." *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2000) (citing *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)). The Ohio Supreme Court has provided clear guidance on the issue of who bears the burden of persuasion in proving exceptions to statutes in general: "The burden rests upon the party who, as the basis of his claim or defense, asserts that he is within an exception or an exemption in a contractual stipulation or a statute to prove all the facts necessary to bring himself within such exception or exemption." *Speidel v. Schaller*, 55 N.E.2d 346, 351 (Ohio Ct. App. 1943) (citation omitted); *see also State ex rel. Nat'l Broad. Co. v. City of Cleveland*, 526 N.E.2d 786, 790 (Ohio 1988) ("Under

Ohio law, a person asserting an exception is required to prove the facts warranting such an exception."); *Carver v. Twp. of Deerfield*, 742 N.E.2d 1182, 1185 (Ohio Ct. App. 2000) (same). With the Ohio courts having consistently followed this general principle of statutory construction, we have no difficulty in holding that the district court did not err by requiring Jeff to bear the burden of proof in regard to the fraud-on-the-partnership exception contained within Section 1775.11.

**2.**

We next turn our attention to whether the FDIC provided the district court with sufficient proof as to the amount of money Steve embezzled to support MBS's ongoing operations to allow the district court to grant summary judgment. Jeff argues that he provided the district court with enough evidence to require a trial on the issue of whether, and in what amount, MBS benefitted from Steve's embezzlement scheme. Specifically, Jeff notes that he provided the district court with nearly two hundred pages of reports from the USTA detailing the winnings that MBS horses, trainers, and jockeys earned in races from 1998-2001. These receipts reveal that MBS should have received $2,390,029 in revenue from its racing operation during those four years. Because the total amount deposited in MBS's accounts during the years in question was $3,519,782, Jeff argues that at most MBS was unjustly enriched by $803,436 – far less than the $1,904,340 judgment issued by the district court.

There are several flaws with Jeff's argument. Jeff assumes that all of the funds MBS earned through its racing winnings actually made it into MBS's bank accounts. The affidavit Jeff provided in opposition to the FDIC's summary judgment motion does not support this contention. Jeff stated, under oath, that "[a]lmost without exception, I turned all checks over to Steve Miller for deposit in the MBS account." (Aff. of Jeff Miller at 6.) Viewed in the light most favorable to Jeff, all Jeff can demonstrate is that $3,519,782 in checks made it into the hands of Steve Miller. Jeff has not provided any bank records, copies of checks actually deposited, or his own accountants' report to demonstrate how much, if any, of these funds Steve actually deposited. By contrast, Steve's affidavit affirmatively states that he embezzled "more than $1.8 million" to fund

the ongoing operations of MBS. (Aff. of Steve Miller at 3.) The report of the FDIC's forensic accountants only traced funds that originated at ODBC and made their way into designated accounts of MBS that did not contain even the most general of offsetting entries. Thus, the FDIC can trace $1,722,223 directly from ODBC into MBS's accounts and another $182,117 from ODBC to third parties in satisfaction of debts owed by MBS.

As the district court demonstrated in its order granting summary judgment, Jeff's own mathematical calculations do not withstand scrutiny. The figures cited by Jeff as revenues inappropriately include the $182,117 of obligations to third parties that MBS paid with embezzled funds. Jeff's revenue figures also include winnings from Eternal Camnation Stables, an entirely separate partnership with separate accounts that the FDIC did not allege any embezzled money reached. Upon subtracting the payments to third parties and Eternal Camnation's winnings, the difference between the revenues that Jeff asserted MBS earned and the total deposits into MBS's accounts equaled $1,129,753. As noted above, Jeff cannot demonstrate that any of these revenues actually made it into MBS's accounts. Jeff only can assert that he gave the checks to his brother Steve. (Aff. of Jeff Miller at 6.) The district court thus faced a set of figures whose authenticity a team of forensic accountants and numerous spreadsheets vouched for and a contrasting set of assertions by Jeff that included extraneous revenues from other business ventures and a lack of any proof that the funds ever actually reached MBS. Summary judgment is appropriate where reasonable minds could not disagree as to the conclusion to be drawn from the evidence. *Anderson*, 477 U.S. at 250 (noting that summary judgment and a motion for a directed verdict under Rule 50 are governed by essentially the same standard). Because the FDIC could trace the funds directly from ODBC to MBS, the district court did not err in granting summary judgment in favor of the FDIC and holding that MBS received $1,904,340 in embezzled funds to support its ongoing operations. *See id.* at 252 (noting that a court should grant summary judgment where the evidence is "so one-sided that one party must prevail as a matter of law").

Our dissenting colleague takes issue with our analysis and argues that it is "uncontested" that Steve "handled all things financial," "did all of the banking," and

"kept all of the records pertaining to the business." (Dis. Op. at 24.) The quoted conclusory statements are all contained in Jeff's affidavit and are presented without elaboration. Yet, the FDIC presented evidence that, far from being a fiscal neophyte, Jeff maintained nearly complete control of MBS's checkbook. Out of 3,553 checks written on the account from January 1, 1998, until December 31, 2001, Jeff's signature appears on 3,547 of them. Jeff has not countered this evidence in any way. Jeff himself has provided us with nearly two hundred pages detailing the winnings of MBS's steeds. Thus, far from being in the dark because of "Steve's monopolization of MBS's financial . . . information," (Dis. Op. at 26), Jeff had reason to know exactly how much MBS spent and what revenues it received. Consequently, Jeff also had reason to know of the benefit conferred by the embezzled money because the racing revenues did not support the expenditures made – all that Ohio law requires to find unjust enrichment. *Hambleton*, 465 N.E.2d at 1302 (requiring solely knowledge of the benefit, not of the benefit's origin, to find unjust enrichment).

It is Jeff who bears the burden of proof as to the fraud on the partnership exception. *See State ex rel. Nat'l Broad. Co.*, 526 N.E.2d at 790. Nonetheless, it is the FDIC that has come forth with the all of the hard evidence. Jeff has failed to produce even one endorsed check to support his contention that Steve made all MBS's deposits and "monopolized" MBS's finances. The FDIC has provided 3,547 checks that prove otherwise. No rational juror could find that Jeff's bare assertions of ignorance outweigh this profusion of paperwork. *Anderson*, 477 U.S. at 250 (only when the factual issues "may reasonably be resolved in favor of either party" must a district court conduct a trial). Despite the dissent's protestations otherwise, this is hardly a case "in which one partner managed the business without the other partner's involvement." (Dis. Op. at 27.)

*Merchants Advance, L.L.C. v. Boukzam*, 2008-Ohio-4860 (Ct. App.), demonstrates that $1,904,340 represents the proper measure of damages under Ohio law. In *Merchants Advance*, the Ohio Court of Appeals faced a similar circumstance where the plaintiff sought to recover from the new owner proceeds from a loan made to a prior owner of a chain of restaurants. The prior owner entered into an agreement with the

plaintiff whereby the plaintiff would provide $242,000 to fund the restaurants' normal business operations in return for the right to receive $350,000 from the restaurants' future credit-card receipts. *Id.* at ¶ 6. After the plaintiff made the final advance of the $242,000, the prior owner transferred the restaurants to the new owner, who promptly breached the agreement by refusing to turn over any of the credit-card receipts. *Id.* at ¶ 8. The plaintiff sued, claiming that the new owner was unjustly enriched by the funds the prior owner had received. *Id.* at ¶ 10. The Ohio Court of Appeals held that even though the prior owner had already spent the monies advanced by the plaintiff, and thus not retained them, the new owner had to refund the money the plaintiff loaned. *Id.* at ¶¶ 34-37. The benefit conferred by the plaintiff that the new owner retained was not the advanced money but rather the going concerns, *i.e.*, the restaurants whose operations the money funded. *Id.* at ¶ 34.

The facts here are quite similar. The funds Steve embezzled allowed MBS to operate. After Steve's indictment, Jeff transferred all of MBS's assets to his new sole proprietorship, JMS. The benefit Jeff retained was a going concern; he knew of this benefit, *see* Ohio Rev. Code Ann. § 1775.11; and it would be unjust to allow Jeff to retain the benefit. Thus, the district court did not err in ordering Jeff to pay restitution to the FDIC as receiver for ODBC in the amount of $1,904,340. *Cf. id.* at ¶¶ 34-37.

While we have resolved all the legal issues, the dissent says one issue is yet outstanding – a concern that our resolution of this case is somehow unfair. How can it be proper for Jeff Miller, whom we must and do assume was completely unknowledgeable of his brother's embezzlement scheme, to find himself facing a judgment of more than $2 million? The dissent's call for a jury to decide the issue highlights this quandary.

We could respond by noting that it is not the province of the jury to decide issues of equity; the jury's domain is only to decide those claims that are, or would have been, cognizable at common law. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708-09 (1999). However, the dissent's concern stems from its assumption that Jeff is also a victim in this case, along with the ODBC depositors, whose money Steve

embezzled and in whose shoes the FDIC stands.  Ohio's elected legislature and courts have reasonably determined as a matter of public policy that where such a situation arises, absent fraud or some other affirmative defense, it is the original victim – here the FDIC – who is to be made whole.  *Cosby*, 750 N.E.2d at 1213 (noting that passive retention of a benefit where such retention is "unconscionable" is enough to trigger liability).  As our job in this case is solely to apply Ohio law, our role is to apply Ohio's resolution of this public policy question, not to second guess the determination or shift the question to a jury for further "equitable" deliberation.  Ohio has already deliberated the issue.  Commensurate with the our limited judicial role, we have enforced its decision about where the loss should lie.

## III.

Because the defendants have failed to demonstrate that there is any "genuine issue as to any material fact," the district court was correct to employ summary judgment to find in favor of the FDIC as to its unjust enrichment claims under Ohio law.  Fed. R. Civ. P. 56(c).  We therefore affirm the judgment of the district court in its entirety and remand the case for further proceedings.

————————————

**CONCURRENCE**

————————————

RONALD LEE GILMAN, Circuit Judge, concurring.  I concur with the lead opinion in this case.  But I write separately to further explain why I believe that the district court did not err in holding Jeff liable to the FDIC for the approximately $1.9 million benefit conferred on MBS by Steve's embezzlement from ODBC.  This discussion pays particular attention to the rationale underlying the fraud-on-the-partnership exception in explaining why Jeff was unable to successfully invoke the doctrine as a defense to the FDIC's unjust-enrichment claim.

Steve of course knew that MBS was enriched to the tune of $1.9 million that he had embezzled from ODBC.  The question before us, however, is whether this knowledge may be imputed to Jeff under Ohio Rev. Code § 1775.11.  This statute allows a court to impute knowledge of an action taken by one partner to all the partners in a partnership, "except in the case of a fraud on the partnership." *Id.*  The resolution of this case therefore depends on our construction of that provision of the Ohio code.

**I**

Section 1775.11 of the Ohio Revised Code states that

> [n]otice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

In other words, the knowledge of one partner of "any matter relating to partnership affairs" will generally be imputed to the other partners.  But the statute also creates the exception that knowledge will not be imputed to the other partners "in the case of a fraud on the partnership committed by or with the consent of that partner." Ohio Rev. Code § 1775.11.

The statutory text codifies, word-for-word, section 12 of the Uniform Partnership Act of 1914 (UPA).  A well-regarded treatise explains the rationale behind UPA § 12 as follows:  "UPA § 12 . . . anticipates that there is communication among partners, imputes knowledge where such communication should exist, and, by creating a cost for noncommunication, imposes a need for communication."   J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice:   General and Limited Partnerships* § 8:34 (2008).

The treatise also explains that the main goal of the fraud-on-the-partnership exception is to allow a partnership that has been defrauded by one of its partners to sue the defrauding partner.  *Id.*  Without this exception, knowledge of the fraud would be imputed to the innocent partners.  This would mean that "a partnership could not sue [that partner] for fraud because knowledge of the fraud defeats one of the elements of a fraud action."  *Id.*  The exception therefore aims to avoid the absurd situation where an innocent partner is barred from suing another partner who defrauds the partnership.

But the exception is not intended to prevent third parties from pursuing claims against the entire partnership for unjust enrichment.  As the district court explained in *Grassmueck v. American Shorthorn Association*, 365 F. Supp. 2d 1042 (D. Neb. 2005), the fraud-on-the-partnership exception

> does not apply 1) when the fraud is committed for the benefit of the partnership, 2) with respect to the rights of third parties acting without knowledge of the fraud, or 3) when the partner perpetrating the fraud acts as the sole representative or "alter-ego" of the partnership.  Under such circumstances, the partnership is charged with the knowledge of that partner and cannot use lack of knowledge as a defense.

*Id.* at 1049-50 (citations omitted), *aff'd* 402 F.3d 833 (8th Cir. 2005).

Just to be clear, the above-quoted language from *Grassmueck* was construing the 1997 version of the Uniform Partnership Act, not the 1914 version that has been codified in Ohio.  *Grassmueck*, 365 F. Supp. 2d at 1049-50 (citing § 102(f) of the UPA of 1997).  But the 1997 version of the UPA did not change the way the fraud-on-the-partnership exception was expressed.  *Compare* UPA of 1997 § 102(f) (imputing the knowledge of

one partner to the entire partnership "except in the case of a fraud on the partnership committed by or with the consent of that partner."), *with* UPA § 12 (using identical language to state the fraud-on-the-partnership exception).

**II**

Jeff attempts to defend himself from the FDIC's unjust-enrichment action by invoking the fraud-on-the-partnership exception, claiming that Steve's embezzlement from ODBC constituted fraud on MBS.  He also alleges that Steve defrauded MBS by embezzling from MBS directly.

At first glance, Jeff's position seems plausible.  There is no reason to doubt Jeff's claim that he knew nothing of Steve's embezzlement from ODBC.  Nor is the assertion that Steve embezzled from MBS entirely implausible (although Jeff provides no persuasive evidence of this allegation).  Jeff reasons that the FDIC is not entitled to summary judgment because these are instances of fraud on the partnership that prevent Steve's knowledge of MBS's $1.9 million benefit from being imputed to Jeff.

Our dissenting colleague is apparently persuaded by this line of reasoning, concluding that there is a genuine issue of material fact as to whether Jeff may invoke the fraud-on-the-partnership exception.  As a result, our dissenting colleague concludes that the FDIC is not entitled to summary judgment for the $1.9 million.

**III**

Jeff's argument, however, is without merit for several reasons.  First, Steve's embezzlement from ODBC was not a fraud "on the partnership" because MBS *benefitted from* the embezzlement. *See* Ohio Rev. Code § 1775.11.  Jeff is therefore unable to invoke the fraud-on-the-partnership exception because partners may not do so "when the fraud is committed for the benefit of the partnership." *See Grassmueck*, 365 F. Supp. 2d at 1049.

Nor can Jeff rely on allegations of Steve's embezzlement from MBS to protect himself from liability to the FDIC.  This is because the fraud-on-the-partnership

exception "does not apply . . . with respect to the rights of third parties acting without knowledge of the fraud." *Id.* The relevant third party in this case is the FDIC, which had no knowledge of Steve's purported embezzlement from MBS. Indeed, the question of whether Steve embezzled from MBS is entirely irrelevant to the nature of the FDIC's unjust-enrichment claim, which is based solely on recovering the money that Steve embezzled from ODBC (including the $1.9 million). *See Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (stating the elements of unjust enrichment).

Moreover, the main purpose of the fraud-on-the-partnership exception, as previously noted, is to permit innocent partners to sue a fellow partner who has defrauded the partnership. Without the exception, the imputation-of-knowledge rule would prevent the innocent partners from doing so. But this right of Jeff to sue Steve for any funds that the latter may have embezzled from MBS does not bar the FDIC, as an innocent third party, from pursuing its unjust-enrichment action against Jeff for the $1.9 million that was embezzled from ODBC. *See Grassmueck*, 365 F. Supp. 2d at 1049-50 (explaining that the exception cannot be used to undermine the rights of third parties who have no knowledge of the particular fraud at issue).

**IV**

Jeff's main response to the FDIC's claim is that Steve had complete control over MBS's finances. But there are two problems with this response. First, as the lead opinion accurately notes, the claim that Jeff had no such control is simply wrong: Jeff signed approximately 3,500 checks on behalf of MBS. He was also able to produce reams of documentation detailing MBS's winnings from horse racing. These facts all but eviscerate the notion that Jeff had no control over MBS's finances.

Then there is the second problem. Even assuming *arguendo* that Jeff indeed ignored all financial matters relating to MBS, Part III above explains why he cannot invoke the fraud-on-the-partnership exception to avoid liability to the FDIC, which is an innocent third party. I therefore conclude that the district court did not err in granting summary judgment to the FDIC with respect to the $1.9 million.

**V**

For all the reasons set forth above, I concur with the lead opinion.

———————————

**DISSENT**

———————————

KENNEDY, Circuit Judge, dissenting. Even accepting that Jeff bears the burden of proof regarding the fraud-on-the-partnership exception to personal liability, Jeff proffered sufficient evidence such that a genuine issue of material fact existed on the issue of fraud on the partnership. *Cf.* Maj Op. at 12-13. I would reverse the district court's grant of summary judgment in favor of the FDIC and remand for a trial with respect to the personal liability of Jeff individually as a partner for the partnership's liability. Therefore, I respectfully dissent.

I.

As a preliminary matter, I note that the failure of the district court to enter separate judgments in this case on the FDIC's different claims against the different plaintiffs has added to the confusion in this appeal. The FDIC's motion for summary judgment makes clear its four distinct claims: "(1) MBS and Jeff Miller as a general partner of MBS - $1,904,340.00, jointly and severally; (2) Jeff Miller d/b/a JMS - an amount to be determined representing the value of the MBS partnership at the time of the transfer of substantially all of its assets to JMS; (3) Jeff and Lori Miller - $65,000.00, jointly and severally, on the 52.85 acres of land in Paulding County; and (4) Jeff and Lori Miller - $128,340.00, jointly and severally, [for their share of] the 55.8 acres of land in Paulding County." J.A. at 157.

The FDIC's claims against Jeff and Lori for unjust enrichment in the amounts of $65,000 and $61,870–claims (3) and (4) here–are largely uncontested on appeal except to the extent that these properties were also subject to forfeiture as a result of Steve's criminal trial, and it is unclear whether that forfeiture is subordinate to these claims. The government is not entitled to claim either twice. With regard to claim (4), Jeff and Lori are held liable for unjust enrichment in proportion to their share of the price of acquiring

the 55.8-acre property.[1]  I agree with the majority that we should affirm the judgment of the district court with respect to these claims.

I also agree that Jeff and JMS are liable for unjust enrichment on claim (2) to the extent of the partnership's assets transferred to Jeff, to be valued by the district court. With the approval of the district court in Steve's criminal case, all MBS assets were transferred to JMS, without consideration, to maintain the operational value of the business.  J.A. at 172-73.  United States Trotting Association rules prohibited MBS horses from racing if Steve, under indictment, remained involved with the partnership. J.A. at 172.  Upon transfer of MBS assets to Jeff, according to Steve, "[t]he value of [MBS] exceeded $1 million."  J.A. at 89.  Jeff does not contest that these JMS assets must be forfeited to the government, either as part of Steve's criminal proceedings or here to the extent that the partnership is liable, and I agree that Jeff has been unjustly enriched by the transfer of these assets and that the FDIC is entitled to the value of the assets.  J.A. at 379.  I would remand to the district court to decide the appropriate valuation date.

I dissent only from the majority's conclusion on the FDIC's first claim–Jeff's personal liability as a partner, derivative of MBS's unjust enrichment, for the entire $1,904,340 embezzled by Steve and deposited in the partnership bank account.  As the district court correctly pointed out, the critical question here is whether Steve committed a fraud on the partnership under Section 1665.11 of the Ohio Revised Code.[2]  If he did, personal liability should not flow from MBS to Jeff as a partner for any unpaid portion of the partnership debt, assuming Jeff had no actual knowledge of the fraud.  The district

---

[1]Jeff and Lori owned approximately 48% of the property that cost $128,340 to purchase.  The property was co-owned by Jeff, Lori, Steve, Steve's wife, and Seth Miller, Jeff's son.

[2]The statute reads as follows:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, *except in the case of a fraud on the partnership* committed by or with the consent of that partner.

O.R.C. § 1775.11 (emphasis added).

court answered this question twice, initially concluding that the FDIC was not entitled to summary judgment against Jeff because it failed to rebut Jeff's testimony that he was ignorant as to the source of the funds deposited in the partnership bank account and thus failed to demonstrate that knowledge should be imputed to Jeff. J.A. at 399.[3] On the FDIC's motion for reconsideration, the district court shifted the burden of proof from the FDIC to Jeff to prove fraud on the partnership. However, the court left in place its prior ruling that there was an issue of fact as to Jeff's actual knowledge of any embezzlement and his brother's fraud. The FDIC had raised an argument in its brief that Jeff should have known the discrepancy existed, but, by its ruling, the district court rejected that argument. As to the fraud-on-the-partnership issue, the district court then ruled that Jeff had failed to raise enough evidence of to raise a genuine issue of material fact of fraud on the partnership to defeat the FDIC's summary judgment motion. However, even with the burden of proof on Jeff as to the fraud-on-the-partnership exception, I believe that the district court should have denied summary judgment for the following reasons.

II.

A genuine issue of material fact exists as to whether Steve committed a fraud on the partnership. Steve's purported fraud on the partnership would defeat the imputation of the knowledge of MBS's unjust enrichment from Steve to Jeff, and thus remove personal liability flowing from the partnership to Jeff.

The following facts put forth by Jeff are uncontested. In his affidavit in opposition to summary judgment, Jeff stated that Steve "handled all things financial," "did all of the banking," and "kept all of the records pertaining to the business" at his home. J.A. at 171. The affidavit continued: "[t]he statements from our checking account even went to Steve's home, not the farm." *Id.* Jeff "turned over to Steve all revenue

---

[3] "Plaintiff contends O.R.C. § 1775.11 permits the imputation of Steve Miller's knowledge of the unjust enrichment of MBS to the partnership. However, as the emphasized portion of § 1775.11 clearly holds, no imputation can be made where there was fraud on the partnership committed by a partner. Here, the fraud was perpetrated by Steve Miller, a partner in MBS. Unlike the loans made to Jeff and Lori Miller of which they admit knowledge, there is no evidence controverting Jeff Miller's testimony that he had no knowledge that funds embezzled from ODBC were placed in MBS accounts or were used to pay MBS expenses. Therefore, the Court finds Plaintiff has failed to satisfy the knowledge requirement of its unjust enrichment claim against MBS for $1,904,340.00." D.Ct. Opinion (March 23, 2007)

received by MBS to pay the farm note and other obligations." *Id.* He knew nothing of Steve's embezzlement.

It is undisputed that Steve embezzled the $1,722,223 from Oakwood which he transferred into MBS's bank account or used to purchase the two properties. Jeff does not question this. Appellant Br. at 18. The parties differ on the amount earned by MBS over the relevant period. Jeff asserts that MBS had income of $2,716,346 from race winnings during this period which were turned over to Steve to pay the operating expenses of the partnership, while the FDIC asserts that MBS had income of $2,390,029.[4] Jeff turned all winnings over to Steve. The total amount of deposits in MBS's bank account during its existence was $3,519,782. The total amount of checks written from the MBS account was $3,548,526.84.

This evidence reveals that Steve used the MBS account as his own personal slush fund, stealing both from Oakwood and the partnership, while he deceitfully portrayed the financial affairs of the partnership as if it were a profitable business. The difference between the sum of embezzled funds plus MBS revenue and MBS deposits reveals a persuasive measure of MBS revenue stolen by Steve.[5] Steve stole money from Oakwood and mixed it together with that stolen from the partnership in the MBS account. Neither party disputes that Steve had charge of managing MBS's funds. Without Steve's deposit of funds stolen from Oakwood and with financial transparency

---

[4]The roughly $300,000 difference in earnings relates to the winnings of Eternal Camnation, which were deposited into a separate bank account. Maj. Op. at 13. Jeff claims that the horse was owned by the partnership and that its winnings were part of the partnership earnings. In addition, Jeff testified that monies won by a horse, Dex The Balls, in the amount of $208,000, which were also deposited in a separate account, was revenue to the partnership since the partnership had a 95% ownership interest in the horse. Taken in the light most favorable to Jeff, it seems that Jeff could reasonably have believed that both of these amounts were earnings of the partnership. If Jeff truly believed that these were partnership earnings, then the difference between earnings and expenditures of the partnership from Jeff's point of view would be closer to $600,000 over the three-year period. Viewed from his perspective, then, it is even more reasonable to conclude that Jeff did not realize that there was an apparent discrepancy between the partnership's income and expenditures.

[5]The computation follows using FDIC's figure for MBS income: ($2,390,029 + $1,722,223) - $3,519,782 = $592,470.

The majority holds that Jeff should have known of the embezzlement because there was a discrepancy between the partnership's winnings and its expenditures. But the earnings and expenditures were almost all in relatively small amounts, Steve kept all of the books, and Jeff always turned the winnings over to Steve during the period in question. That the winnings were not equal to the expenditures is apparent now but would not have been obvious at the time to someone who, like Jeff, had no access to the books and who was not keeping track of the winnings or expenditures.

and honest accounting, the partnership's budget shortfalls would have become apparent to Jeff, and the partnership would have ended for lack of economic viability with minimal personal liability to Jeff. Instead, the evidence gives rise to the inference that Steve artificially propped up MBS financially by making embezzled funds available to the partnership in MBS's bank account. Jeff has testified that he had no idea that this was going on. Steve's monopolization of MBS's financial situation shielded that information from Jeff to ensure the ongoing viability of his fraudulent scheme.[6] Steve apparently made sure to keep enough money in the MBS account so that the checks Jeff wrote did not bounce.

The district court should have found the above allegations and evidence sufficient to defeat summary judgment even under the standard it followed.[7] Furthermore, the mere fact that Jeff has provided evidence that Steve misappropriated partnership funds without his actual knowledge is sufficient to show fraud on the partnership. *See Ventre v. Datronic Rental Corp.*, No. 92 C 3289, 1996 WL 681279, at *8 (N.D. Ill. Nov. 21, 1996) (unpublished) (denying a motion to dismiss where plaintiff-partner is not imputed knowledge of partner who investigated the accounting of alleged fraudulent transactions because plaintiff alleged that other partners committed fraud on the partnership by misappropriating and diverting partnership funds); *Batchelor v. Fort Scott Assoc.*, No. CA92-1119, 1993 WL 183651, at *3 (Ark. App. May 26, 1993) (unpublished) (no knowledge of fraud imputed to the partnership where partner arranged for partnership money to be paid out as a "secret commission" to a third partner and this

---

[6]Nonetheless, Jeff, to the best of his ability, provided evidence as to the partnership revenue turned over to Steve for partnership expenses. Jeff's ability to produce such information was limited by Steve's monopolization of and refusal to provide any records and should not be counted against Jeff, especially at the summary judgment stage.

[7]In its order granting summary judgment to FDIC after the rehearing, the district court relied on *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169 (1984), which would require a showing of 1) a representation, or where there is a duty to disclose, concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, without knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance. However, the only element that is conceivably contested by anyone in this case is whether Jeff reasonably relied on Steve's misrepresentations (i.e. whether Jeff had any knowledge of what Steve was doing). In my opinion, the evidence Jeff has provided is sufficient to rule that there is a genuine issue of material fact with respect to this element and that summary judgment should be denied.

along with other actions by the partner constituted a fraud on the partnership);  *Allied Chemical Co. v. DeHaven*, 824 S.W.2d 257, 265 (Tex. App. 1992) (partnership not bound by partner's knowledge that other partner's deal with a chemical company benefitted the chemical company at the expense of the partnership where the misappropriation of funds from the partnership by this other partner through this deal constituted a fraud on the partnership); *McIntosh v. Detroit Sav. Bank*, 225 N.W. 628, 630 (Mich. 1929) (partner committed fraud on the partnership by depositing partnership funds into his own account, therefore the court did not impute knowledge of that partner's fraud to the partnership); *see also Marine v. Commissioner*, 92 T.C. 958, 977 (1989) (embezzlement by a partner constitutes a fraud on the partnership such that knowledge of that embezzlement should not be imputed to the partnership).

Courts have also held that a partner has committed fraud on the partnership where one partner maintained sole responsibility for a business function and managed that business of the partnership as if it were doing fine when in fact it was not.  *See Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 75 (1st Cir. 2001) (holding that a reasonable jury could find fraud on the partnership for fraudulent concealment where a joint co-venturer maintained sole responsibility over selecting, preparing, and purchasing a manufacturing plant for a construction materials manufacturer (the innocent partner); allegedly discovered violations of environmental regulations at the plant site, knew that the plant was overvalued, and appreciated the obsolescence of the plant's equipment; and carried through on the business deal as if everything was OK, when in fact that partner ought to have told the innocent party of those material facts).  In *Oreto v. Limbach,* No. 91AP090066, 1992 WL 89970 (Ohio App. 5 Dist. Apr. 20, 1992), an unpublished Ohio decision, the court dealt with the precise situation in which one partner managed the business without the other partner's involvement. 1992 WL 89970 at *2.  The partner managing the business never told the other partner that he had received notice of a tax assessment and left it unpaid.  *Id.*  The court held that the innocent partner had alleged enough on the issue of fraud on the partnership to survive a motion to dismiss a request for a hearing on his personal liability.  *Id.*  Likewise here, Jeff deserves a trial where a genuine issue of fact exists as

to whether Steve committed a fraud on the partnership by stealing MBS funds and taking sole control over partnership funds as part of a scheme to benefit from misrepresenting the state of the partnership's finances.

III.

The concurring opinion seems to agree that there is insufficient proof that Jeff had actual knowledge of the embezzlement; or, at least, he takes no issue with the district court's previous ruling, which is still intact, that Jeff had no actual knowledge. The concurrence instead focuses on the fraud-on-the-partnership question and argues that it is inapplicable in this situation. I disagree.

The concurrence relies heavily on the contention that the fraud-on-the-partnership exception "'does not apply . . . with respect to the rights of third parties acting without knowledge of the fraud.'" Conc. Op. at 18 (citing *Grassmueck v. Am. Shorthorn Assoc.*, 365 F. Supp. 2d 1042 (D. Neb. 2005)). The court in *Grassmueck* relies on the American Jurisprudence treatise for its position that the rights of innocent third parties should not be affected by fraud-on-the-partnership exception. *See* Am. Jur. 2d. Partnership §210. But this provision seems to apply only in the context of the relationship between the partnership and the innocent third party. It says nothing of the relationship between innocent partner and innocent third party. I have not suggested that the partnership here should be able to avail itself of the fraud-on-the-partnership exception to relieve it of any liability to Oakwood Bank. Indeed, I agree with the majority that summary judgment is appropriate with respect to all of the funds that unjustly enriched the partnership itself. *See supra* at 2. However, this is simply not relevant to the question of whether Jeff, an innocent party as well, may avail himself of the exception in order to limit his personal liability.

The concurrence also suggests that fraud-on-the-partnership exception should not apply when the fraud is committed for the benefit of the partnership. The concurrence then asserts, without explanation, that MBS benefitted here from the embezzlement. Although the partnership may have been unjustly enriched, there is simply no merit to the assertion that it benefitted from the embezzlement. As I state above, Steve's

indiscriminate use of the funds for his own benefit did nothing good for Steve or the partnership. As the record indicates, MBS was an enterprise engaged in what appeared to be a successful racing business, one that was turning in not insubstantial legitimate revenue from race winnings. The embezzlement, however, led to the partnership's continued operation when, unknown to Jeff, its expenses were exceeding its income. I find it hard to believe, then, that Steve's embezzlement, which he used primarily as his own personal slush fund, could be considered a benefit to the partnership qua partnership.

## IV.

I take a moment to comment on the irony that the majority opinion holds Jeff, proprietor of Jeff Miller Stables, a horse racing operation worth in the ballpark of $1 million, personally liable for nearly $2 million for "unjust enrichment." Unjustness aside, where is the enrichment? By all accounts, Jeff worked slavishly managing the day-to-day operations of an unprofitable partnership, and by the time the partnership assets had been transferred to him individually, its worth was only approximately half of the alleged embezzled amount. During MBS's operation and since, the record we have indicates that Jeff only drew a salary; he did not share in non-existent profits.[8] The majority states that "[t]he funds Steve embezzled allowed MBS to operate" in benefit of Jeff. Maj. Op. at 15. Quite the contrary, economic failure, or in an economist's parlance, a "correction," would have been the best benefit to Jeff. It would have caused him to terminate the partnership and escape with minimal debt if any. No doubt, the subsequent transfer of all MBS assets to JMS enriched Jeff. Oakwood's embezzled funds put into the partnership itself unjustly enriched Jeff as a partner to that extent, even should a factfinder decide that Steve did defraud the partnership. Thus, I concur that any assets possessed by the partnership that were transferred to Jeff personally unjustly enriched him. But to what extent Jeff should be held personally liable as a partner is a question for a factfinder to decide, in accordance with his claimed fraud-on-the-

---

[8] There is no suggestion that Jeff received an excessive salary. He cared for the horses for seven days a week, raced them, bred them, and sometimes was the jockey.

partnership defense under O.R.C. § 1775.11.  For the foregoing reasons, I respectfully dissent.